**S. Rebecca DACHMAN, Plaintiff,**

v.

**Donna SHALALA, Secretary, Department of Health & Human Services, Defendant.**

**Civil No. AMD 96–873.**

United States District Court, D. Maryland.

April 13, 1999.

Francine K. Weiss, Kalihavi, Chuzi & Newman, Washington, DC, Dr. S. Rebecca Dachman, M.D., Silver Spring, MD, for plaintiff.

Barry F. Smith, U.S. Department of HHS, Business & Administrative Law Division, Washington, DC, Lynne A. Battaglia, U.S. Attorney, George Levi Russell, III, Assistant U.S. Attorney, Baltimore, Md, for defendant.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff, Sarah Rebecca Dachman, M.D., an Orthodox Jew and a former employee of the Food and Drug Administration ("FDA"), an agency of the Department of Health & Human Services, instituted this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"). Her claims include one or more of the following theories: sex discrimination, race discrimination, religious discrimination, retaliation and hostile environment.[1] As redress, Dr. Dachman seeks declaratory, injunctive and various forms of corrective relief and damages.

In this memorandum, I shall address all claims except plaintiff's termination claims. Plaintiff essentially alleges that her supervisors at the FDA discriminated against her on the basis of sex, race and religion, took retaliatory actions against her, and intentionally created an abusive and hostile work environment in violation of Title VII over the four year period culminating in her termination in early 1998. I have carefully considered the parties' submissions and conclude that no hearing is necessary. Local Rule 105.6 (1997). For the reasons stated below, I shall grant defen-

---

1. Dr. Dachman was represented by counsel throughout the administrative processing of her claims and up until the conclusion of discovery in these proceedings. She is pres- ently unrepresented, however, having discharged her counsel after the pending motions were filed.

dant's motion for summary judgment.[2]

## I. UNDISPUTED FACTS OR FACTS IN LIGHT MOST FAVORABLE TO PLAINTIFF

### A. Introduction

I present here a full factual account of the evidence and information contained in the record. For purposes of ruling on the motions, plaintiff is entitled to have "her version of matters in dispute accepted, and the benefit of all favorable inferences," *Fisher v. Maryland Dept. of Housing Community Dev.*, 32 F.Supp.2d 257, 262 (D.Md.1998), at least so long as there is proper support in the record under Fed. R.Civ.P. 56 for her version of events.

Dr. Dachman graduated with honors from the George Washington University School of Medicine in 1983. She became employed by the FDA in 1988. Initially, she worked part-time and later she became a full-time employee.

Dr. Dachman worked as a medical officer at the Center for Biologics Evaluation and Research ("CBER"), where she was responsible for reviewing drug licensing applications, investigational new drug applications and responding to inquiries regarding such applications. Up until at least 1995, Dr. Dachman's job performance evaluations reflected that her performance was "fully successful" to "excellent."

Dr. Dachman began her career at the FDA with a core group of other medical officers. This core group included, but was not limited to, Dr. William Schwieterman, Dr. Margaret Mitrane, Dr. Patricia Keegan and Dr. Karen Weiss. From time to time during the events at issue in this case, Drs. Weiss, Schwieterman and Keegan, respectively, were Dr. Dachman's first level supervisors. Dr. Jay Siegel was her second level supervisor. Dr. Weiss and Dr. Siegel adhere to the teachings of Reform Judaism and Conservative Judaism, respectively.

---

**2.** Prior to filing the lawsuit, Dr. Dachman had filed three EEO administrative complaints alleging discrimination and retaliation on February 24, 1995, September 12, 1995, and February 28, 1996. She filed her complaint in this court on March 22, 1996. Defendant filed her answer on June 3, 1996. The parties engaged in six months of discovery and there arose several disputes over discovery. *See Dachman v. Shalala*, 950 F.Supp. 708 (D.Md. 1997).

On January 24, 1997, defendant filed a so called "partial motion to dismiss." On March 10, 1997, I granted plaintiff leave to file a first amended complaint, to which defendant filed an answer on March 19, 1997. On July 7, 1997, after repeated skirmishes over discovery issues, defendant filed her motion for summary judgment. On July 24, 1997, plaintiff filed a consolidated response in opposition to the defendant's "partial motion to dismiss" and motion for summary. These papers are the objects of the court's attention in this memorandum opinion.

In September 1997, while the dispositive motions were pending, plaintiff filed a motion for leave to file a second amended complaint to add claims which allegedly had matured during the pendency of the action in this court. Around this time, it was clear that plaintiff would file at least one additional administrative complaint because she had

been placed on suspension pending termination. (In fact, plaintiff filed several administrative complaints with the EEO office after September 1997.). On October 14, 1997, in the interest of judicial economy, I denied without prejudice defendant's "partial motion to dismiss" and motion for summary judgment and plaintiff's motion for leave to file a second amended complaint, with an eye to having plaintiff's looming termination claim joined in this action once that claim had been properly exhausted. In early 1998, Dr. Dachman obtained substitute counsel and then, shortly thereafter, discharged her attorneys altogether.

On July 6, 1998, after Dr. Dachman had discharged her counsel, I was advised that plaintiff had exhausted her administrative remedies in respect to the termination claims. Subsequently, I have attempted, but have been largely unsuccessful in those attempts, to get plaintiff to assert her termination claims in a cogent fashion so that the case can be adjudicated in an orderly way. Relatedly, plaintiff has persisted in her efforts to get voice exemplars and telephone records from one of her co-workers for reasons mentioned *infra*, note 3, and also to convince the court to require defendant to produce computer records of e-mail. I decline to do so.

Plaintiff's termination claims will be addressed at a later time.

Dr. Dachman had a collegial relationship with her colleagues when she first began working at the FDA. However, the nature of her relationship with her colleagues eventually deteriorated into rancor and strife. Dr. Dachman eventually filed innumerable charges of discrimination against her supervisors with the Equal Employment Opportunity ("EEO") office. Dr. Dachman blames her supervisors and co-workers for the failure of the collegial relationship she had with them. Defendant Shalala contends, however, that Dr. Dachman's unprofessional and inappropriate workplace behavior and poor job performance were the major factors that contributed to the disintegration of the relationship and ultimately led to her termination from employment at the FDA. In any event, the record reflects that the relationship began to sour in 1993 and, on February 6, 1998, Dr. Dachman was discharged from her position at the FDA.

Through Dr. Dachman's eyes, there were two major events that culminated in her discharge from employment with the FDA. First, she believes that her protests to Dr. Siegel that his sexual advances towards her were unwelcomed caused him to turn against her. Second, she believes that Dr. Schwieterman acted deliberately to have her arrested for allegedly leaving a threatening message on his office voice mail. (Dr. Dachman also contends, alternatively, that the threatening voice mail message was actually left by one of her co-workers who mimicked Dr. Dachman's distinct accent.). As for Dr. Schwieterman, Dr. Dachman has come to believe that his motives were based on an aversion to her religious beliefs. Dr. Dachman further believes that her supervisors and coworkers, with discriminatory animus, conspired to discredit her professionally and to have her removed from her job.

## B. Evidence of Unwelcomed Sexual Conduct by Dr. Siegel

In 1990, Dr. Dachman became the key medical reviewer of a clinical trial application to study a drug that dissolves cardiac blood clots. The project was dubbed "GUSTO." It was the largest such project that had been submitted to CBER. In October 1993, an amendment to the license application was submitted, and Dr. Dachman was appointed chair of the "GUSTO" Product License Application ("PLA") advisory committee. In addition, she became the lead reviewer of the trial data.

On occasion, Drs. Dachman and Siegel worked together closely. Dr. Dachman asserts that beginning in early 1993, Dr. Siegel began touching her on the forearm, always on or near the same spot. Dr. Dachman estimates that between early 1993 and April 1994, Dr. Siegel touched her forearm approximately ten times. Although Dr. Dachman felt uncomfortable with this contact, she did not voice any objection to the touching because she did not know Dr. Siegel's motivation. In May 1994, however, Dr. Dachman began to suspect that Dr. Siegel's motives were sexual in nature and she asked him to stop touching her. Her suspicions about his motives derived from her observation that he never touched her when he was angry with her. Dr. Dachman told him that it bothered her when he touched her because, as an Orthodox Jew, she is not accustomed to casual contact with men. Dr. Dachman testified that Dr. Siegel touched her only three times after she confronted him about his behavior.

Dr. Siegel does not deny that he touched Dr. Dachman on the forearm on numerous occasions. He testified, however, that he was only trying get her attention and to point out something that they were reviewing. He testified that despite his efforts to respect Dr. Dachman's wishes, she had to remind him on occasion.

One stormy evening in May 1994, Drs. Siegel and Dachman were working in his office on the GUSTO project. Dr. Dachman testified that without warning, Dr. Siegel turned off the lights. Dr. Dachman feared that Dr. Siegel was going to sexually attack her. Immediately, she shouted

"Jay, what the hell are you doing? I'm a married woman!" Dr. Siegel responded immediately and turned the lights back on. He explained to Dr. Dachman that he had only wanted to look at the lightning. Afterwards, Dr. Dachman asked Dr. Siegel to keep the door open while they worked and Dr. Siegel complied with her wishes.

So far as the record discloses, these allegations comprise the entirety of Dr. Dachman's evidence of unwelcomed sexual behavior by Dr. Siegel.

### C. Dr. Dachman is Forced to Take Administrative Leave

As chair of the GUSTO PLA committee, Dr. Dachman was responsible for coordinating tasks related to the project. Other committee members were assigned specific roles and tasks. On one occasion in July 1994, Dr. Dachman's colleague, Dr. Glen Jones, was responsible for circulating documents to the PLA committee. Dr. Dachman testified that because Dr. Jones had previously failed to follow her instructions about circulating documents, she decided to handle the job herself. On July 11, 1994, Dr. Dachman circulated the documents without first notifying Dr. Jones that she was going to handle the task. Dr. Dachman's actions in assuming Dr. Jones's role caused confusion among the committee, and so displeased Dr. Jones that he complained to Dr. Dachman's immediate supervisor, who was by then Dr. Schwieterman. Dr. Schwieterman instructed Dr. Dachman to apologize to Dr. Jones through the electronic mail system and to copy other members of the committee. Initially, Dr. Dachman agreed to apologize as instructed, but she soon changed her mind. She decided that it would be humiliating to make a public apology and that to do so would have the effect of diminishing her role as chair of the committee. Instead of sending an apology by electronic mail, Dr. Dachman apologized to Dr. Jones privately and in person.

On July 13, 1994, Dr. Dachman went to Dr. Schwieterman's office to explain why she should not have to apologize to Dr. Jones by electronic mail. At this meeting, there was great tension between Drs. Schwieterman and Dachman. In due course, Dr. Schwieterman told Dr. Dachman that he did not wish to discuss the matter any further and he asked her to leave his office. Dr. Dachman refused to leave. She insisted on continuing the discussion. Again, Dr. Schwieterman asked her to leave his office and advised her that if she did not leave he would be forced to call security. Still, Dr. Dachman refused to leave. Dr. Schwieterman called security and departed his office, followed by Dr. Dachman. On deposition, Dr. Schwieterman testified that when Dr. Dachman refused to leave his office, he felt isolated and became frightened. He testified that his fear stemmed from his knowledge of an incident in 1993 in which Dr. Dachman had become angry in the workplace and damaged property. Shortly after the first incident, Dr. Dachman returned to Dr. Schwieterman's office and security was again summoned. Dr. Dachman later wrote a lengthy apology/explanation to Dr. Schwieterman.

Dr. Dachman does not deny that Dr. Schwieterman had to call security before she was willing to leave his office. She justifies her refusals to leave on grounds that she was only following Dr. Siegel's instructions to be persistent in her dealings with Dr. Schwieterman. She had received a letter from Dr. Siegel at the time Dr. Schwieterman became her immediate supervisor. (The letter alluded to earlier difficulties with Dr. Dachman's work performance and her resistance to close supervision.). Dr. Siegel had admonished her to seek and accept the supervision of Dr. Schwieterman. Specifically, the letter stated: "You should accept his suggestions and directions unless you persuade him otherwise." It is clear in the record that Dr. Dachman has seized on this directive, which was manifestly intended to curb her insouciance toward supervision, as a li-

cense to her to behave in utterly inappropriate and unprofessional ways.

Thus, Dr. Dachman testified that when she visited Dr. Schwieterman on the evening of July 13, 1994, she was only trying to *persuade* him that it was not necessary for her to offer a public apology to Dr. Jones. She admits, however, that she was "nagging" him. On deposition, Dr. Dachman testified as follows:

A: I was just in his room nagging him.

Q: And was he your supervisor at the time?

A: Yes.

Q: And was that appropriate behavior for a subordinate to nag a supervisor?

A: It's behavior that I always exhibited.

\* \* \* \* \* \*

Q: What other choice did Dr. Schwieterman have but to call security to get you to leave his office?

A: He could have sat down and asked me what's really bothering me.

\* \* \* \* \* \*

Q: Assuming that the security guard had not come, would you have left his office?

A: Yeah, if he would have sat down, if he would have calmed down.

Q: Under your conditions?

A: No. If he would have been calm and said, "Listen, why don't we all sleep on it tonight, and tomorrow we'll talk about it," I would have left.

Q: Do you believe that your refusal to leave one of your superiors' office after a request to do so is insubordinate conduct?

A: No.

\* \* \* \* \* \*

Q: I think to be insubordinate in my world or in my definition, you would refuse to follow a legitimate order. I didn't think what he was asking me to do was legitimate. I didn't feel that writing that apology was legitimate, and refusing to talk to me was also not legitimate.

Dachman Dep. at 340–44.

Dr. Dachman testified that she often nagged her supervisors and had on several occasions refused to leave their offices when asked to do so. She views her conduct as symptomatic of a tenacious pursuit of the truth and a desire to maintain public safety with regard to the evaluation of drugs. Dr. Dachman testified that it was her practice to "argue points that were correct and for the public benefit that others might have dropped."

Dr. Dachman's attitude toward the proper role and behavior of subordinates is further evidenced by her testimony regarding an occasion when she asked Dr. Siegel for assistance in designing an audit for the GUSTO project. She testified that he refused to meet with her to design a plan, so she began following him around the work place. She also testified that she would appear at his office unannounced hoping that he would help her. Dr. Dachman testified that even after he would insist that she leave his office, she would refuse to do so until he had answered her questions or until after she had argued her point to resolution. It is evident from the record that Dr. Dachman's supervisors did not share her view that her actions were mere instances of dogged but commendable persistence in truth-seeking or problem-solving.

### D. Dr. Dachman is Suspected of Criminal Behavior

Two days after the ugly confrontations with Dr. Schwieterman in the latter's office regarding the need to apologize to Dr. Jones, an event occurred that triggered the turmoil that is the focus of this case. The event completely altered Dr. Dachman's personal and professional life. On the afternoon of July 15, 1994, Dr. Schwieterman retrieved a threatening

message from his office voice mail. After listening to the message several times, he reached the conclusion that the messenger was Dr. Dachman because it sounded like her. The message was: "Hi, I'm going to haunt you. Be afraid, I'm at your house, so be afraid. You [sic] will kill you." Def.'s Mem.Supp.Mot.S.J., Ex. 13 at 2.

To determine how to handle the matter, Dr. Schwieterman first contacted his supervisor, Dr. Weiss who, in turn contacted her supervisor, Dr. Siegel, for advice. When Dr. Schwieterman played the recorded message for Drs. Siegel and Weiss, they also believed that the voice could have been that of Dr. Dachman, but they were less certain.

Eventually, Dr. Schwieterman contacted Nancy Webber, the head of FDA security. She testified that she advised Dr. Schwieterman to contact the Montgomery County Police Department because the threat was personal. She also testified that she advised him to contact the agency's Internal Affairs office, but only after he informed her that he believed another government employee made the threat.

Officer Matney of the Montgomery County Police Department arrived at the work site to take a report from Dr. Schwieterman. Dr. Schwieterman told Officer Matney that he believed Dr. Dachman left the threatening message for him and that he took it seriously. He also informed Officer Matney of his altercations with Dr. Dachman on July 13, 1994, and the need to summon security officers. Manifestly, Dr. Schwieterman believed that the events of July 13, 1994, led Dr. Dachman to leave the threatening message. Officer Matney suggested that Dr. Schwieterman file a criminal complaint against Dr. Dachman with the Montgomery County Maryland District Court Commissioner (a Montgomery County ordinance prohibited telephone threats).

Subsequent to his meeting with Officer Matney, Dr. Schwieterman informed Dr. Weiss of his election to file a sworn complaint with the commissioner. With Dr. Weiss's permission, Dr. Schwieterman left work on July 18, 1994, to file a criminal complaint against Dr. Dachman. As a result of the complaint filed by Dr. Schwieterman, the court commissioner issued an arrest warrant for Dr. Dachman.

According to Dr. Dachman, she learned about the warrant from Officer Matney after she was lured unwittingly into a meeting with him on July 18, 1994. She testified that both Drs. Siegel and Schwieterman advised her to report for a 3:00 p.m. meeting that day. When she asked Dr. Siegel what the meeting was about, he refused to tell her. True to form, Dr. Dachman resorted to "nagging" Dr. Siegel to get him to tell her the purpose of the meeting. She followed him to lunch, outside of the building and down the street, repeatedly asking him to tell her what the meeting was about. Dr. Dachman contends that her supervisors were secretive about the subject of the meeting because they did not want her to know that she was going to be interrogated by a police officer. Indeed, she was questioned by Officer Matney about the threatening message. She believes that she was unnecessarily interrogated by Officer Matney, and she complains that he did not advise her of her rights. She infers (but lacks even a scintilla of evidence to support the inference) that her supervisors' cooperation in arranging her surprise interview by the police in connection with the threatening message constitutes evidence of their prohibited animus toward her.

At the meeting, Dr. Dachman explained to Officer Matney that she was being framed by a colleague, that she had not left the threatening message and that he would see the truth if only he would conduct a voice analysis of the recorded message.[3] At some point, Dr. Dachman even

---

**3.** Dr. Dachman has charged throughout this litigation that her colleague, Dr. Margaret Mi-

trane framed her and that it was Dr. Mitrane who left the threatening message for Dr.

offered an alibi for her whereabouts at the time the threatening message was made.[4] Joseph Salweski, a colleague at the FDA, prepared a statement for Dr. Dachman's defense in the criminal case indicating that it was more probable than not that he was in a meeting with Dr. Dachman at the time the threatening call was made. It does not appear, however, that this alibi information was investigated by the police. The Office of Internal Affairs of the FDA did review this information when that office conducted an independent investigation of the threat made to Dr. Schwieterman. Otherwise, there is little information in the record regarding it.

The next day, Dr. Siegel ordered Dr. Dachman to take a week of administrative leave with pay. Dr. Siegel told her that the primary reason for putting her on leave was to avoid a confrontation with Dr. Schwieterman. Dr. Dachman testified that Dr. Siegel told her that he was taking the action because Dr. Schwieterman was afraid of her. The evidence of record also reflects that Dr. Dachman's supervisors had for some time been concerned about her work performance and work habits, but had generally failed to confront her about their concerns. Also, to resolve his ongoing concerns about plaintiff keeping government documents at her home, Dr. Siegel ordered Dr. Dachman to use the paid leave period to gather and return to the agency all government documents that she had taken home.

Schwieterman. Although I permitted Dr. Dachman to take discovery on this issue, when Dr. Dachman's expert suggested that there was a need to have Dr. Mitrane disguise her voice to enable him to make a legitimate analysis, I cut off this line of inquiry. In the final analysis, there has been no factual development in the evidence establishing that plaintiff was framed or that Dr. Mitrane left the threatening message. Relatedly, in parallel litigation removed from state court and adjudicated before Judge Messitte of this court, Dr. Dachman unsuccessfully pursued claims against Dr. Schwieterman. *See Dachman v. United States,* Civil No. PJM 96–1261

### E. Dr. Dachman is Arrested

While Dr. Dachman was on leave, she was afraid that she would be arrested on the Sabbath. To avoid the humiliation of being arrested at her home on the Sabbath, Dr. Dachman reported to the police station. She was arrested, fingerprinted, photographed, and released on her own recognizance.

Although Dr. Dachman was originally scheduled to return to work on July 25, 1994, Dr. Siegel extended her leave until July 27, 1994. Dr. Siegel testified that he extended the leave period because

> it was important, upon her return to the workplace, to have a very clear plan as to what guidance she would receive in terms of her working relationship, her reporting relationship; what actions she might not be subject to regarding issues such as leave and that rather than have her return in an area where there might be ambiguity and where there had been problems in the past, it was felt that it was best—she was on paid administrative leave during this time, and it was necessary to have a clear picture to present to her of what the expectations of her were in the work environment upon her return.

Def.'s Mot.Summ.J., Ex. 10 at 115.

### F. Dr. Dachman is Suspended for her Behavior in July 1994

When Dr. Dachman returned to work, Dr. Siegel removed her as chair of the GUSTO PLA committee and on July 28,

(D.Md. Nov. 7, 1996), *aff'd,* 155 F.3d 558, 1998 WL 414057 (4th Cir. Jul 23, 1998) (unreported), *cert. denied sub nom. Dachman v. Schwieterman,* —— U.S. ——, 119 S.Ct. 906, 142 L.Ed.2d 905 (1999).

4. Apparently, it could be determined that the call was not made from a telephone on the FDA system but instead, it seems clear that the call was placed from an "external telephone." The record seems not to disclose whether such an "external telephone" could have been a pay telephone on or near the FDA campus.

1994, he proposed a 14 day suspension without pay on the ground that Dr. Dachman had exhibited "repeated insubordinate, disrespectful, and disruptive behavior." Dr. Siegel noted the following behavior to support the proposed suspension: (1) failing to leave Dr. Schwieterman's office on July 13, 1994; (2) repeatedly asking him (Dr. Siegel) the purpose of the July 18, 1994, meeting, including interrupting him during a telephone conversation and following him to lunch; (3) failing to obey instructions not to enter the workplace during her administrative leave; (4) failing to return government documents from her home on July 25, 1994, as instructed; and (5) telephoning him at his home on July 19, 1994, regarding the GUSTO project, even though he had instructed her that she should not call him at home on non-urgent matters.

Dr. Dachman opposed the suspension. On August 30, 1994, plaintiff requested a stay of the proposed suspension pending a decision in the criminal case. She reasoned that since the alleged precipitating event for the proposed suspension was plaintiff's refusal to leave Dr. Schwieterman's office on July 13, 1994, and the criminal case evolved from events of that day, a stay was appropriate. Dr. Kenneth Seamon, Acting Director, Office of Therapeutics Research and Review, denied her request for a stay. In the end, however, Dr. Dachman's suspension was not effected until January 23, 1995, after the criminal case had ended, as set forth below.

Specifically, on December 28, 1994, the Montgomery County state's attorney entered a *nolle prosequi* in Dr. Dachman's case. Despite her earlier request for a stay, Dr. Dachman contends that Dr. Seamon delayed ruling on the proposed suspension until January 1995 because he believed that Dr. Dachman would be found guilty. There is, however, little (if any) evidence in the record from which one could draw the inference that Dr. Seamon delayed the suspension on this ground. It appears from the record that Dr. Seamon carefully considered the situation and made a final decision only after he had evaluated plaintiff's counsel's written and oral submissions (including a 12 page single-spaced letter brief) and other information gathered from interviews with Drs. Weiss, Schwieterman and Siegel.

### G. Dr. Dachman is Detailed to Epidemiology

Immediately upon Dr. Dachman's return from suspension in February 1995, Dr. Seamon detailed her to the Division of Biostatistics and Epidemiology. He had discussed the issue with Drs. Siegel and Weiss. Dr. Seamon testified that he had come to the conclusion that the situation had become intolerable to Dr. Dachman, her supervisors and other employees. He testified further that Dr. Dachman had told him on numerous occasions that it was very difficult for her to work at the office. He believed that the increasing performance problems Dr. Dachman was experiencing, including her failure to follow directions, reporting to work late, and disappearing during work hours, were the result of Dr. Dachman's discomfort and unhappiness at work. Dr. Seamon testified that he believed that the detail to Epidemiology would give everybody some relief. He also believed the detail would be beneficial to the Epidemiology Division because they were working on a project involving cardiac issues and Dr. Dachman had expertise in that area.

Dr. Dachman opposed the detail. She denies ever telling Dr. Seamon that she was uncomfortable or unhappy. She contends that she told Dr. Seamon she was enjoying her job. Dr. Dachman contends that she was assigned to a lesser position in Epidemiology and received a reduction in pay, responsibilities and prestige. There is no evidence in the record other than Dr. Dachman's subjective belief that Dr. Dachman was paid less or that her responsibilities were reduced or less prestigious. These contentions are based on

plaintiff's perception that the Epidemiology position held less prestige than a position in her former unit. The detail covered the period February through May 1995. (It should be noted that Dr. Dachman's supervisors all testified that they had been displeased with her job performance over a long period of time, but none seems to have recorded contemporaneously specific acts of poor performance, malfeasance or insubordination by Dr. Dachman.).

## H. Dr. Dachman is Reassigned to Oncology and is Denied a Requested Detail

Following the dismissal of the criminal charges against Dr. Dachman, Dr. Seamon authorized the Office of Internal Affairs to begin its own investigation of the threatening voice mail message. The Internal Affairs investigation was completed on May 18, 1995. The agent in charge was unable to substantiate the charge against Dr. Dachman and the investigation was closed.

On May 27, 1995, following the completion of her detail in Epidemiology, Dr. Dachman requested reinstatement to her former position. The request was denied, and Dr. Dachman's resistance to the reassignment resulted in a further suspension, described below. On June 7, 1995, she was reassigned permanently to the Oncology Branch. Dr. Patricia Keegan, chief of the branch, became Dr. Dachman's immediate supervisor. Drs. Weiss and Siegel remained in the chain of command.

Although Dr. Dachman's pay grade and benefits remained the same, she viewed her reassignment to Oncology as a demotion and a dead-end for her career. She testified:

Q: Now, when you were assigned to oncology, it's my understanding that you didn't take a downfall in grade or pay or benefits; correct?

A: No.

Q: Did you take a downfall—did your duties or responsibilities change?

A: As I had previously stated, yes. Prior to being in oncology, I was involved in retrials. Those are the trials at the end to determine whether a drug works.... I was also involved in a lot of policy making; okay? I had developed a network of interagency committees that I worked with, and people from other parts of the agency that I dealt with on actual policy and endpoints. And all that ended ... And now all I do is mostly Phase 1's which is the kind of stuff that somebody does when they're new to the agency.

\*　　\*　　\*　　\*　　\*　　\*

Q: [W]hy was there a lack of advancement opportunities?

A: [B]ecause what is unique to the oncology division is that almost everybody employed there—every medical officer is an oncologist by training. Not always in every other division of FDA are there doctors employed, specifically trained for that area. Oncology, it is so. And most of the people who rise into team leadership positions, therefore, have that specific training because oncology is so—you really have to know the field.... And so all almost every team leader is an oncologist. I am, I think, the only medical officer in oncology who is not an oncologist or an immunologist, which deals with transplants, or a nuclear medicine person, which deals with all the imaging that people go through when they're being tested for cancer.

\*　　\*　　\*　　\*　　\*　　\*

A: I am a qualified physician, but I'm not trained for oncology. And because I'm not trained as an oncologist, they would never allow me to be a leader. And basically, when I came in, Pat's first reaction was she

didn't know what she was going to do with me.

Dr. Dachman asserts that Dr. Keegan, on deposition, admitted that there was no promotion potential for her in Oncology. Dr. Dachman presents a skewed interpretation of Dr. Keegan's testimony. Dr. Keegan testified as follows:

Q: How did you see Dr. Dachman's future in Oncology, since she's not an oncologist?

A: Could you clarify the future?

Q: Advancement.

A: Advancement to my job.... That's basically the next level up....

Q: Okay. What about—well, how about your job? What's her likelihood of getting your job?

A: At the moment? I'm not leaving, so—

Q: Assume you get a promotion ... [w]ould you recommend her for your job?

A: Not at the moment.... Because she isn't doing the job that she's supposed to be doing right now well, and I don't think she would do my job better.

Pl.'s Consol.Opp., Ex. 27 at 70–71.

Frustrated with what she viewed as a lack of advancement opportunities in Oncology, Dr. Dachman began participating in lunch hour discussions at the Center for Devices and Radiological Health ("CDRH"). Dr. Keegan was unaware of Dr. Dachman's participation in these meetings, but by October 1995, Dr. Dachman had apparently arranged a detail for herself to that unit. Dr. Keegan learned of the arrangement only after Dr. Dachman had asked Dr. Siegel to approve the detail. Dr. Siegel instructed Dr. Dachman to talk to her supervisor, Dr. Keegan. When Dr. Dachman refused to share information about the detail with Dr. Keegan, Dr. Keegan turned to her supervisor, Dr. Weiss, to intervene. Dr. Weiss contacted Dr. Wolfe Saperstein, Deputy of Cardiovascular De-

vices for CDRH, to discuss the proposed detail.

Apparently, Dr. Saperstein expressed his delight at the prospect of having Dr. Dachman detailed to his unit. Nevertheless, following her discussion with Dr. Saperstein, Dr. Weiss denied Dr. Dachman's request for a detail to CDRH. Dr. Weiss told Dr. Dachman that she was denying the detail because there was little possibility of a permanent assignment or promotion potential for Dr. Dachman with that unit. In addition, Dr. Weiss said she did not consider a part-time (i.e., Tuesday through Thursday) detail of Dr. Dachman to be in the best interest of the Oncology Branch. Dr. Dachman contends that Dr. Weiss's reasons for denying the detail are not legitimate because she had been assigned very little work in Oncology. Dr. Dachman also contends (without support in the record) that there may have been potential for a permanent position and promotion at CDRH.

I. Dr. Dachman is Suspended from October 25, 1995 through November 7, 1995

From October 25, 1995 to November 7, 1995, Dr. Dachman was on suspension imposed by Dr. Seamon. Dr. Seamon testified that he suspended Dr. Dachman for failing to follow supervisory instructions and for unacceptable conduct.

The suspension had been proposed earlier, following a meeting Dr. Seamon had with Dr. Dachman following her return from the earlier suspension. Cindy Lepson from Personnel attended that meeting. The meeting was originally scheduled to take place on May 31, 1995, but at plaintiff's request the meeting was rescheduled for June 7, 1995. The purpose of the meeting was to inform Dr. Dachman that she was being reassigned to the Oncology Branch. On the evening of June 6, 1995, Dr. Seamon found a note on his desk from Dr. Dachman setting out her own agenda for the meeting. Also, Dr. Dachman noted that she intended to be represented by

counsel at the meeting. Based on advice he received from the Personnel Office, Dr. Seamon left plaintiff a note on the morning of June 7, 1995, explaining that there would not be enough time to cover the items on her proposed agenda and informing her that she was not entitled to have counsel at the meeting.

Dr. Seamon had allotted only a half hour for the meeting. Dr. Dachman reported 20 minutes late to the meeting, and she was accompanied by counsel. Dr. Seamon refused Dr. Dachman's request to allow her counsel to sit in on the meeting.

On June 28, 1995, Dr. Seamon proposed that Dr. Dachman be suspended on grounds that she had exhibited insubordinate and unacceptable conduct in connection with the June 7, 1995, meeting. He charged that Dr. Dachman was insubordinate because she disobeyed his order not to bring counsel to the meeting. She was charged with unacceptable conduct on the basis that she repeatedly interrupted Dr. Seamon during the course of the meeting, raised her voice, and became agitated.

On July 31, 1995, Dr. Dachman's counsel responded on her behalf to Dr. Seamon's notice of proposed suspension. Dr. Dachman responded that she was not insubordinate because "Dr. Seamon was not entitled to have his order obeyed [because] [t]he law does *not* deny counsel at such meeting[s]." Def.'s Mot.Summ.J., Ex. 28, at 178. She asserted that she had received information from the FDA's legal counsel that she was entitled to have counsel present at the meeting. In deciding to suspend Dr. Dachman, Dr. Seamon stated in the suspension letter that he gave her the benefit of the doubt regarding her view that counsel could be present, and that ground was not sustained as a basis for disciplinary action.

### J. Dr. Dachman is Placed on Leave Restriction

Dr. Keegan placed Dr. Dachman on leave restriction beginning on November 17, 1995. In the leave restriction memo-

randum to Dr. Dachman, Dr. Keegan indicated that she was imposing the restrictions due to her concerns regarding Dr. Dachman's poor attendance and leave use. Dr. Keegan attests that from the outset of her supervision of the plaintiff, she had concerns regarding plaintiff's leave requests and attendance:

> I often did not know her whereabouts, she often did not sign in or out when arriving at or leaving work, and she often failed to submit leave slips (SF–71s), as required of all employees. An audit showed that from July 8, 1995 through November 11, 1995, she had a negative balance of annual leave (7.5 hours) and had accrued 216.75 hours of leave without pay due to an insufficient amount of annual leave to cover her absences.

Def.'s Mot.Summ.J., Ex. 29 at 2. Dr. Keegan informed Dr. Dachman of the results of the audit and told her how difficult it was for her (Dr. Keegan) and personnel to keep track of plaintiff's comings and goings. She also told plaintiff that her leave practices were creating a disruption in the office and that she would be placed on leave restriction. Dr. Dachman believes that Dr. Keegan was treating her unfairly. She contends that when she arrived in Oncology there was no policy regarding requesting leave and that she had asked Dr. Keegan on several occasions what procedure to use. Plaintiff asserts that a leave policy was not instituted until October 1995. However, she admits that by June 7, 1995, she had used many hours of leave because of the numerous proceedings related to her complaints of discrimination.

Dr. Dachman claims that Dr. Keegan imposed the restrictions on her because she is an Orthodox Jew. In a formal complaint filed with the EEO office on February 28, 1996, Dr. Dachman charged that the "restriction constitutes religious discrimination and retaliation against me for filing EEO complaints and opposing discriminatory practices." Specifically, Dr.

Dachman was displeased that she was now only allowed to take no more than two hours ("before sundown") as religious compensatory time ("RCT"). She contends that two hours is unreasonable and that Dr. Keegan's imposition of a two hour limit was an arbitrary decision that did not take into consideration the fact that she had to leave early to purchase Challah bread. Plaintiff contends that before Dr. Keegan limited her RCT to two hours, Dr. Keegan had questioned her about the legitimacy of her religious practices. She views the RCT limitation as discrimination because it makes it difficult for her to follow orthodox practices.

Dr. Keegan testified that she worked with the personnel office in setting the amount of RCT plaintiff could take on Fridays. Dr. Keegan said that she "drew on the first conversation I had with Rebecca, where she told me if she could leave by 4:00 p.m. on Fridays, that that should cover it for her RCT and, if she needed to leave earlier, that she would take annual." Dr. Keegan recalls that she decided on a certain number of hours to grant plaintiff because Dr. Dachman failed to submit leave slips in a timely fashion and it made it difficult for her to approve them in time. She testified that "we—Ms. Lepson thought that a more reasonable alternative would simply be to clarify how much religious compensatory time I would routinely grant." Pl.'s Consol.Opp., Ex. 27 at 123.

Dr. Dachman denies that she had a poor leave record. She says that the leave record Dr. Keegan reported was fabricated to support Dr. Keegan's imposition of leave restrictions. Nonetheless, Dr. Dachman has offered no evidence to support this claim. Nor has she offered evidence demonstrating that Dr. Keegan acted arbitrarily in imposing the leave restriction or actually denied her leave in an improper manner.

### K. Dr. Dachman's Performance Evaluation is Changed and Changed Again

By the time Dr. Dachman joined Oncology in mid–1995, the idea that her supervisors were out to destroy her career had become firmly etched in her mind. Circumstances surrounding the preparation of her performance evaluation for the year ending September 1995 only cemented that idea. Initially, Dr. Dachman received an overall rating of "fully successful." When plaintiff reviewed the evaluation she noted that she had been rated only "minimally successful" on the element concerning writing assignments. She said that she signed off on the evaluation and did not complain about the low rating because she was satisfied with the overall rating. She signed off on the evaluation on November 30, 1995. In December 1995, Dr. Keegan changed the overall rating to "marginally successful." Drs. Keegan and Weiss explained that the overall rating was changed because agency guidelines (previously overlooked) prevent an employee from being rated "fully successful" when the employee receives a low rating on a "critical element." "Writing assignments" was a critical element of Dr. Dachman's job.

Dr. Dachman did not learn about the change until January 18, 1996. She believes that the events involving the change in her rating represent another attempt by her supervisors to destroy her professional reputation and career. Quite correctly, she notes that during the evaluation process, Dr. Keegan sought Dr. Wise's evaluation of plaintiff covering the period of time she served the detail in Epidemiology, February through May 1995. Dr. Dachman suggests that Drs. Keegan and Weiss attempted to force Dr. Wise to rate her poorly to obtain support for the marginal rating. Although there are documents in the record indicating that Drs. Weiss and Keegan were concerned about Dr. Wise's election to compliment plaintiff's abilities in certain areas, there is no evidence that plaintiff's supervisors acted improperly. Contrary to Dr. Dachman's assertion, there is also no evidence indicating that

she was penalized. Eventually, in the fall of 1996, the rating was converted back to "fully successful."

### L. Dr. Dachman is Charged AWOL

Dr. Dachman complains of two instances of being charged absent without leave by Dr. Keegan. She alleges that on December 29, 1995, and January 26, 1996, Dr. Keegan unlawfully charged her AWOL. The record shows as a matter of law that Dr. Dachman's complaints are unfounded. Dr. Keegan explained that Dr. Dachman was charged AWOL on December 29, 1995, because she left the office for two hours without requesting leave. On January 26, 1996, Dr. Dachman reported to work late and started forty minutes after the core hours. Dr. Dachman does not deny that she was absent from the office during these times without official approval. She simply contends that she should be excused because on December 29, 1995, she went to the Personnel office to review agency policies and had no work to do and, on January 26, 1996, she was visiting an EEO counselor.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy,* 929 F.2d at 1012.

In Title VII cases, courts are often wary of summary judgment motions because a party's intent is often the crucial element in such cases. *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 254 n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Summary judgment is appropriate in such cases, however, where any factual dispute does not rise to the level of a "genuine issue of material fact." *See Boarman v.*

*Sullivan,* 769 F.Supp. 904, 906 (D.Md. 1991) ("traditional precepts of summary judgment may apply, except where the evidence presents a genuine issue of motive"). Summary judgment should also be granted when a party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, on which the party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. In the instant case, a careful review of the record establishes that there is no genuine dispute of material fact, and that defendant is entitled to judgment as a matter of law on all of Dr. Dachman's non-termination claims.

## III. ANALYSIS

### A. Introduction

As a preliminary matter, defendant moved for dismissal on the ground that the majority of Dr. Dachman's allegations of discrimination were not administratively exhausted in a timely fashion. Defendant also argued that other allegations are not cognizable because plaintiff failed altogether to raise these claims prior to the filing of this civil action. In addition, defendant contended that many allegations do not constitute "adverse personnel actions," and therefore, fail to state a cognizable claim under Title VII. Defendant also asserted that on the merits, plaintiff has failed to establish a prima facie case of race, gender, and religious discrimination, retaliation, and harassment/hostile work environment.

### B. Exhaustion of Remedies

■ Prior to seeking relief for Title VII claims in court, a federal employee must timely exhaust all available administrative remedies. *See* 42 U.S.C. § 2000e–16(c); 29 C.F.R. § 1614.408. A federal employee is required to file an administrative charge with an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory...." 29 C.F.R. § 1614.105(a)(1). In *Zografov v. Veterans Admin. Med. Ctr.,* 779 F.2d 967, 970 (4th Cir.1985), the Fourth Circuit "held that a federal employee's failure to consult with an EEO counselor within the required time after an alleged act of discrimination, i.e., within 45 days, is grounds for dismissing the employee's Title VII claim in federal court." *Blount v. Shalala,* 32 F.Supp.2d 339, 341 (D.Md.1999).

The purpose of the administrative filing requirement is to encourage informal resolution of discrimination claims. 29 C.F.R. § 1601.24. Moreover, the administrative charge provides the agency with notice of what it is to investigate and respondents with formal notice of the alleged practices they are called upon to defend. *Id.* § 1601.12; *see also Powers v. Grinnell Corp.,* 915 F.2d 34, 37 (1st Cir.1990). Following the filing of the initial charge of discrimination, the employee is interviewed by the counselor. Within 15 calendar days following the final interview and receipt of written notice to this effect, the employee must file a formal administrative complaint with the EEO counselor. 29 C.F.R. § 1614.105(d). If informal resolution attempts fail, a plaintiff may then file suit.

■ A plaintiff's civil complaint in court is limited by the scope of the investigation which could reasonably have been anticipated to have grown out of the administrative charge. *Chisholm v. United States Postal Svc.,* 665 F.2d 482, 491 (4th Cir. 1981); *EEOC v. General Elec. Co.,* 532 F.2d 359, 368–69 (4th Cir.1976). "Courts may only exercise jurisdiction over claims encompassed within the EEOC charge and claims 'like or related to allegations contained in the charge, or which grow out of such allegations.'" *Riley v. Technical and Mgmt. Serv. Corp.,* 872 F.Supp. 1454, 1459 (D.Md.1995) (quoting *Nealon v. Stone,* 958 F.2d 584, 590 (4th Cir.1992)). "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge circumvents the EEOC's investigatory and conciliatory role." *Id.* (citation omitted).

■ "Incidents outside the statutory window are time-barred unless they can be related to a timely incident as a 'series of separate but related acts' amounting to a continuing violation." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir.1997). Under the "continuing violation" theory, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if [she] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *Metsopulos v. Runyon*, 918 F.Supp. 851, 858 (D.N.J.1996). "To establish that a claim falls within the 'continuing violation' theory, the plaintiff must demonstrate that at least one act occurred within the filing period ... and that the discrimination is more than isolated or sporadic." *Id.* (citations omitted). In other words, if at least one of a series of separate acts falls within the statutory period, "the effect ... is to sweep within the limitations period the earlier alleged acts of discrimination." *NAACP Labor Committee v. Laborers' Int'l Union, N. America*, 902 F.Supp. 688, 706 (W.D.Va.1993) (quoting *Bradley v. Carydale Enterprises*, 707 F.Supp. 217, 222 (E.D.Va.1989) (§ 1981 action)), *aff'd without op.*, 67 F.3d 293 (4th Cir.1995).

In *Taylor v. Home Ins. Co.*, 777 F.2d 849 (4th Cir.1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986), the Fourth Circuit held that a plaintiff can establish a continuing violation by showing the following elements: (1) the unlawful practice must continue into the limitation period; (2) the claimant must file a timely charge with the EEOC; (3) the proof must establish that the unlawful practices are continuing or ongoing and that it currently affects the plaintiff. *Id.* at 856. A discrete act of discrimination which is not made the target of a timely charge "is merely an unfortunate event in history which has no present legal consequences." *Evans*, 431 U.S. at 558, 97 S.Ct. 1885.

Although the Fourth Circuit has not adopted a test to "determine whether a series of allegedly related events constitutes a continuing violation as opposed to a series of isolated outbreaks," *Douglas v. Dabney S. Lancaster Community College*, 990 F.Supp. 447, 456 (W.D.Va.1997), other courts have. *See DeNovellis v. Shalala*, 124 F.3d 298, 307 (1st Cir.1997) ("continuing violation" denotes systemic violation); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989) (noting test inquires whether "plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory mistreatment") (*dicta*), *aff'd after remand on other grounds*, 963 F.2d 375 (7th Cir.1992). Under the Fifth Circuit's test first adopted in *Berry v. Bd. of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983), *aff'd after remand*, 783 F.2d 1270 (5th Cir.), *cert. denied*, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986), courts analyze three factors: "(1) whether the alleged acts constitute the same type of discrimination; (2) whether the alleged acts are frequent; and (3) whether the alleged acts 'have a degree of permanence which would trigger an employee's awareness and duty to assert his or her rights.'" *Demuren v. Old Dominion University*, 33 F.Supp.2d 469, 477 (E.D.Va.1999) (quoting *Williams v. Enterprise Leasing Co.*, 911 F.Supp. 988, 996 (E.D.Va.1995)).

■ Because the *Berry* test helpfully clarifies what constitutes an enduring discriminatory act, I shall apply it here. *Cf. Sloane v. Shalala*, No. 97–2295, 1998 WL 801499 at *2 (4th Cir. Nov. 18, 1998) ("It is unnecessary for us to adopt any of these tests in this case, for the simple reason that appellant fails to establish a continuing violation under any of them. As the Supreme Court has stated, the 'critical question' in a continuing violation case is 'whether any present violation exits.'") (citation omitted).

436

## C. Time–Barred Allegations and Claims

■ Defendant contends that Dr. Dachman failed to exhaust any claim arising from acts or omissions occurring more than 45 days prior to the plaintiff's first contact on February 24, 1995, with the EEO counselor to initiate a complaint of discrimination, that is, any act or omission occurring before 1995. These allegations include the following: (1) Dr. Siegel repeatedly and regularly yelled and screamed at her, belittled her in public, denied her mentoring, training, support and credit for her work, and made unwelcome sexual advances to her by repeatedly touching her forearm and turning off the lights in the office while they were working alone; (2) Dr. Siegel demeaned her religious practices by purposely scheduling meetings for Friday afternoons to make it more difficult for her to honor the Sabbath, gave her work to complete immediately before Jewish holidays, and called her "Mengele" knowing that her mother was a survivor of Auschwitz; (3) Drs. Weiss and Schwieterman conspired with Dr. Siegel to discredit her; (4) Dr. Schwieterman called security to remove her from his office; (5) Dr. Schwieterman, without the benefit of an adequate investigation, accused her of leaving the threatening voice mail message and then filed a criminal complaint against her; (6) Dr. Siegel forced her to meet with a police officer regarding the complaint; and, (7) Dr. Siegel placed her on administrative leave, removed her as chair of the PLA committee, took away 90% of her work, and proposed her suspension.

It cannot be disputed by plaintiff that these acts of alleged discrimination were not reported timely to the EEO counselor.

Dr. Dachman's deposition testimony and formal complaints filed with the EEO office establish that the acts she complains of occurred in 1994.

Dr. Dachman contends that at the time she sought EEO counseling in February 1995, she was subject to continuing violations, including race, sex, and religious discrimination, retaliation, and harassment/hostile work environment.[5] She contends that the above allegations focus on events that began in March 1994 and continued through January 13, 1995, and represent a continuing pattern of discrimination and retaliation by her supervisors, particularly Dr. Siegel. She asserts:

> Siegel harassed and treated plaintiff disparately and more harshly because she is a woman and an Orthodox Jew. He engaged in a continuous pattern of intimidation, ridicule and insult of plaintiff over a two year period from January 1993 to January 1995, increasing in scope as they worked intensely on the GUSTO review beginning in March 1994, including verbal abuse, unwelcome touching, criticizing her work, facilitating her arrest, and causing her suspension.

Pl.'s Consol.Opp. at 32–33. She further contends that Dr. Seamon's acceptance of the recommendation for suspension on January 20, 1995, is part of the continuing violations and that she filed a timely claim of discrimination regarding the suspension.[6] Therefore, she argues, the 45 day filing period was tolled and the events occurring before January 10, 1995, are not time-barred.

With the exception of the 1995 execution of the proposed suspension, however, it is

**5.** Defendant correctly notes that plaintiff has not specifically alleged counts for harassment/hostile work environment.

**6.** Defendant suggests that the continuing violation theory is not available to plaintiff because she never filed a discrimination charge against Dr. Seamon in respect to her suspension in January 1995. The record reflects, however, that Dr. Dachman submitted an affidavit as part of the investigation into her first filed charges and alleged that Dr. Seamon suspended her in retaliation for opposing Dr. Siegel's discriminatory conduct. *See* Pl.'s Resp. Def.'s Reply, Ex. 1, Resp. # 22, # 23. Accordingly, as a matter of law, Dr. Dachman timely filed a charge of discrimination with the EEO office regarding her January 1995 suspension.

clear that the 1994 grounds of complaint are discrete acts of alleged discrimination, unlike and unrelated to the suspension finally imposed by Dr. Seamon. It is clear from Dr. Dachman's admissions on deposition that the pre-limitations events are isolated and sporadic rather than continuing in nature. Moreover, as a matter of law, Dr. Dachman was fully aware of all the facts and circumstances surrounding her supervisors' treatment of her. *Indeed, her own attorney's September 7, 1994, letter brief to Dr. Seamon, filed in opposition to the proposed suspension, alleged that the suspension would constitute sex discrimination.* Thus, if a discriminatory motive animated any of the 1994 acts and decisions, its presence would have been apparent, and, manifestly, such motives were suspected. Dr. Dachman could have and should have invoked her rights in a timely fashion but she failed to do so. *See Demuren,* 33 F.Supp.2d at 477. Accordingly, the pre–1995 events are time-barred and defendant is entitled to summary judgment on all claims rooted in these events.[7]

### D. Non–Barred Allegations and Claims

Apart from her termination claim which is not now before the court for consideration, Plaintiff's remaining claims are claims for "retaliatory harassment" and a claim for religious discrimination involving Dr. Keegan. I shall first address her retaliatory harassment claim.

#### a. Retaliatory Harassment

In *Settle v. Baltimore County,* 34 F.Supp.2d 969 (D.Md.1999), recognizing that the Fourth Circuit has not explicitly acknowledged "retaliatory harassment" as a form of hostile work environment prohibited by Title VII, I stated:

Consistent with emergent authority in other circuits, I presume that, on a prop-

er factual showing, a plaintiff could meld together the elements of a "traditional" harassment claim, i.e. the creation of an objectively hostile work environment through severe and pervasive abusive conduct, with the essential elements of a "traditional" retaliation claim, i.e., reprisal for opposing or participating in the opposition to, discriminatory policies and practices.

Thus, under such a claim, recovery might be available if, despite the absence of a racial or sexual nexus to the creation of the hostile environment, a prima facie case could be established showing that a hostile environment was motivated by improper retaliation. "Certainly harassment in retaliation for an employee's protected activities could constitute an 'adverse employment action.' " *Cobb v. Anheuser Busch, Inc.,* 793 F.Supp. 1457, 1491 (E.D.Mo.1990); *Drake v. Minnesota Mining & Manuf. Co.,* 134 F.3d 878, 886 (7th Cir.1998) ("retaliation can take the form of hostile work environment"); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1060 (8th Cir. 1997) (systematic retaliation in form of reduction of job duties, disciplinary action, negative personnel reports and required remedial training constituted adverse employment action as a matter of law).

*Settle,* 34 F.Supp.2d at 994.

■ The post-January 10, 1995, events that form the basis of plaintiff's retaliatory harassment claim include: (1) her suspension in January 1995; (2) the Internal Affairs investigation regarding the threatening phone call to Dr. Schwieterman; (3) the detail to the Epidemiology division in February 1995; (4) the change in plaintiff's performance evaluation from "fully

---

7. Defendant also correctly argues that many of the time-barred events also are not cognizable under Title VII because they do not represent materially adverse employment actions. *See Settle v. Baltimore County,* 34 F.Supp.2d 969, 987–89 (D.Md.1999) (discussing, *inter alia, Page v. Bolger,* 645 F.2d 227

(4th Cir.) (in banc), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), and *Munday v. Waste Management of N. Am., Inc.,* 126 F.3d 239, 243 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998)).

successful" to "marginally successful" and back to "fully successful"; (5) reassignment to the Oncology Branch in June 1995; (6) her suspension for 14 days in October/November 1995; (7) denial of the requested detail to Cardiovascular Devices; (8) leave restriction; (9) refusal to appoint plaintiff to committees; (10) refusal to give plaintiff work; (11) criticism of plaintiff's work; (12) refusal to approve leave requests; (13) exclusion of plaintiff from meetings and conversations regarding her work; (14) ordering the surveillance of plaintiff and her children; and, (15) calling the physician of plaintiff's daughter to inquire whether plaintiff had taken the daughter to an appointment. *See Spurlock v. NYNEX,* 949 F.Supp. 1022, 1028 (W.D.N.Y.1996) ("The discriminatory use of disciplinary procedures, surveillance operations, investigations into the private lives of employees, the system by which job assignments are made, and access to overtime opportunities are all in theory potential methods of harassment.").

Despite the multitude of allegations, as a matter of law, plaintiff has failed to establish a prima facie case of retaliatory harassment because she has not provided a basis, beyond her own subjective beliefs, that she has been targeted by her supervisors for disrespectful, career-thwarting treatment. To the contrary, a reasonable fact finder would be compelled on this record to conclude that Dr. Dachman's supervisors have almost without exception been *reactive* to whatever she has presented to them in the way of daily challenges to get her to come to work, remain at work, perform her duties in a professional manner and, most significant of all, to take supervisory instructions and directions respectfully and seriously.

■ What I said in *Settle* applies here: "In evaluating plaintiffs' efforts to project evidence of a prima facie case, it must be recalled that Title VII's protections do not insulate one from either the normal day-to-day dissatisfactions and annoyances commonly arising in any workplace or from the sometimes unpleasantness of a surly, strict or even personally insufferable and demanding supervisor." 34 F.Supp.2d at 991; *and see id.* at 993 ("Accordingly, '[s]ince supervision and [retaliation] are very different ... a [retaliatory] animus cannot be inferred from the day-to-day conduct of supervisors that [plaintiffs] may deem inconvenient, inconsiderate or insufficiently solicitous.'." (citation omitted)). *See also Olivares v. NASA,* 934 F.Supp. 698, 705 (D.Md.1996) ("[T]he fact that an employee may have filed an EEO claim gives him no license to vilify supervisors or co-workers or indeed to make every response of theirs to such vilification the basis of a claim of retaliation.").

■ Furthermore, even if it is assumed that plaintiff has established a prima facie case of "retaliatory harassment" based on the disciplinary and other actions taken against her, the criticisms she received, and her objection to the other seemingly ordinary business decisions actions related to her employment, defendant has offered legitimate, non-discriminatory reasons for the actions. Dr. Dachman has not come forward with evidence to establish—beyond her own subjective belief—that the proffered reasons were pretextual and that her supervisors' true motivations were retaliatory animus. " 'A jury may not ... be allowed to infer [retaliation] from evidence that does no more than suggest it as a possibility.' " *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.,* 160 F.3d 177, 182 (4th Cir.1998) (quoting *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 245 (4th Cir.1982)) (alterations in *Gibson* ). Here, the record positively refutes even the "suggestion" of a retaliatory motive. Accordingly, defendant is entitled to summary judgment.

### b. Religious Discrimination

■ Finally, Dr. Dachman contends that Dr. Keegan did not reasonably accommodate her religious beliefs and practices. She accuses her supervisor of discrimina-

tion in that she limited her RCT to two hours on Fridays, required her to obtain approval for such leave and made it difficult for her to make up RCT.

In *Chalmers v. Tulon Co. of Richmond,* 101 F.3d 1012, 1019 (4th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 58, 139 L.Ed.2d 21 (1997), the Fourth Circuit articulated the framework for analyzing religious accommodation claims. To sustain a claim for religious discrimination plaintiff must demonstrate that: (1) she has a bona fide religious belief that conflicts with an employment requirement; (2) she informed the employer of this belief; and (3) she was disciplined for failure to comply with the conflicting employment requirement. *Id.* (citations omitted). "If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious needs without undue hardship." *Id.* (citations omitted).

Dr. Dachman has failed to satisfy the first and third elements of the prima facie test. The leave restriction imposed by Dr. Keegan made clear that Dr. Keegan would "approve [Dr. Dachman] leaving work for up to two hours before the sun sets." Pl.'s Consol.Opp., Ex. 18 at 5. Dr. Dachman contends that this was too restrictive because "she needed more than 2 hours leave on Fridays to purchase her Sabbath food at a [particular] market." Pl.'s Consol.Opp. at 24. This contention is unavailing.

The record shows that Dr. Dachman told Dr. Keegan she needed to buy challah bread before 2:00 p.m. on Fridays. Dr. Dachman testified that she purchased challah bread from one store in the vicinity of the workplace. She said that store prepared the bread in the manner acceptable to her faith, but it closed at 2:00 p.m on Friday. Def.'s Reply, Ex. 1, at 170–80. Dr. Dachman testified, however, that she "wanted to only work till noon time so that [she] could start making [challah] bread, because [she] thought it would be great for the kids to see that.... But the two hours

barely [gave her] enough [time]." Dachman Dep. at 162. She also testified that there were other stores where she could purchase the bread. There was no factual development of the actual operating hours of these stores.

In any event, Dr. Dachman testified that the challah bread was not a mandatory food item for observance of her Sabbath. She testified as follows:

Q: Is that the only food item that is actually mandatory?

A: It's not mandatory. If I wanted, I could do it with two hard rolls too. But that's not—you know, I hate to say it—it's like if you had Christmas dinner with Spam, you know?

*Id.* at 161.

Dr. Dachman's only other complaint regarding the two hour limitation was that it did not give her enough time to bath her children. *Id.* at 162. Clearly, Dr. Dachman has failed to establish that she had a bona fide religious belief that conflicts with the two hour leave restriction. The only reason she needed additional time was to permit her to purchase or make the challah bread. But it was not a mandatory food item. Significantly, Dr. Dachman concedes that Dr. Keegan never denied her the two hours leave and even granted her additional leave in excess of the two hours, although plaintiff asserts she had to "beg" for the additional leave. Pl.'s Consol.Opp., Ex. 2, ¶ 17.

Dr. Dachman also contends that Dr. Keegan applied the restriction and underlying agency policy in a discriminatory manner. She asserts that Dr. Keegan required that she submit leave slips for approval to take religious compensatory time and would often refuse to sign them in a timely manner. Dr. Dachman says this caused her to worry that she would be charged absent without leave. She also contends that Dr. Keegan interfered with her ability to earn RCT overtime to cover the leave she took for religious observances. She asserts that Dr. Keegan would

not assign her a sufficient amount of work assignments because she did not want Dr. Dachman to be able to earn the overtime. She asserts that this resulted in her being forced to charge the compensatory time to annual leave and leave without pay. *Id.*

■ These contentions, resting as they do on Dr. Dachman's uncorroborated assertions and subjective beliefs, do not carry probative force. "[A] subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief." *Elliott v. Group Medical & Surgical Service*, 714 F.2d 556, 557 (5th Cir.1983), *cert. denied sub nom. Elliott v. Group Hospital Service, Inc.*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984). It is perplexing, at best, as to why Dr. Dachman would have been concerned that she was going to be deemed AWOL. It is obvious from the language in the leave restriction memorandum that Dr. Keegan had committed to approving the two hour leave on a routine basis. Dr. Keegan testified that:

> [T]he fact that Dr. Dachman was not providing me with the leave slip in enough time for me to actually look at it and consider it and give it any time or attention, because of her needs, that we—Ms. Lepson thought that a more reasonable alternative would simply be to clarify how much religious compensatory time I would routinely grant.
>
> And that was the purpose of this memo, to identify basically that routinely I could agree that we could give her two hours.

Pl.'s Consol. Opp, Ex. 27 at 123.

Dr. Dachman cannot establish a prima facie case of discrimination based on this charge absent some showing that Dr. Keegan's actions conflicted with her religious beliefs. She concedes that Dr. Keegan never denied her religious compensatory time. Moreover, requiring plaintiff to obtain approval is an administrative requirement and is not actionable.

Finally, Dr. Dachman has presented no evidence to support her bald and conclusory assertions made by affidavit and on deposition that she was forced to charge RCT to annual leave and leave without pay because Dr. Keegan would not assign her work. "When an inference can be supported by evidence to save it from the status of speculation, ... the non-moving party should present that evidence." *Felty v. Graves–Humphreys Co.*, 818 F.2d at 1128; *see also Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("There is some room for debate as to how 'specific' must be the 'specific facts' that Rule 56(e) requires in a particular case," a nonmovant cannot defeat a motion for summary judgment by merely "replac[ing] conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996) ("[S]ummary judgment affidavits cannot be conclusory.").

Dr. Keegan, on the other hand, has denied under oath that she made it difficult for Dr. Dachman to earn RCT overtime and presented specific information about how much work she assigned and when. She also established the times when plaintiff earned and was denied RCT. Dr. Keegan stated:

> Dr. Dachman has been permitted to work all RCT as requested, with one exception. On April 8, 1996, Dr. Dachman submitted a request on an SF–71 to work 34 hours of RCT as "1–2 hours per day" from "April 8 through April 30, 1996." This request was not approved because it would have been impossible to determine when RCT was being worked and when credit time was being accrued, which would have created significant difficulties for the timekeeper in maintaining an accurate record of compensated RCT. This was particularly problematic because RCT can be worked before *or* after the RCT is taken, which is not true of credit time.... However, between 2/19/96 and 4/14/96, Dr. Dachman did have approval to work RCT on 21 days;

of these, she actually worked RCT on 12 days and came during previously unscheduled times to perform RCT on an additional 5 days.

I deny that I did not provide sufficient work assignments in order for Dr. Dachman to make up time taken for religious activity.... Dr. Dachman's has had ample work available in the form of original [investigative new drug] submissions, IND amendments, and revisions of written work products. [She] was assigned 5 new INDs in September 1995, 1 in November 1995, 1 in December 1995, 2 in January 1996, 2 in February 1996, 3 in March 1996, and 3 in April 1996. During this period, Dr. Dachman received multiple amendments to existing INDs. Many were not reviewed and returned to the Document Control room for months.

Def.'s Mot.Summ.J., Ex. 29 at 3. In light of the defendant's showing, no reasonable juror could rationally find by a preponderance of the evidence that Dr. Keegan acted intentionally to burden Dr. Dachman's exercise of her religious faith and defendant is entitled to summary judgment on the religious discrimination claim.

## IV. CONCLUSION

For reasons stated herein, plaintiff's claims fail and defendant is entitled to summary judgment.