**Dennis OLIVARES, Plaintiff,**

v.

**NASA, et al., Defendants.**

**Civil No. PJM 94–168.**

United States District Court,
D. Maryland.

July 15, 1996.

Dennis Olivares, Arlington, VA, Pro Se.

Deborah A. Johnston, U.S. Attorney's Office, Greenbelt, MD, Christopher B. Mead, London & Mead, Washington, DC, David S. Schuman, NASA, Greenbelt, MD, for Defendants.

## OPINION

MESSITTE, District Judge.

### I.

Dennis Olivares ("Olivares") is an engineer employed by National Aeronautics and Space Administration ("NASA") at the Goddard Space Flight Center ("GSFC") in Greenbelt, Maryland. This case finds him in a rematch against the agency. In an earlier lawsuit, the Court granted summary judgment in favor of NASA and various of its employees on all of Olivares' claims. *See Olivares v. National Aeronautics and Space Admin.*, 882 F.Supp. 1545 (D.Md.1995). Those claims included, among others, alleged violations of the Freedom of Information Act, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, and miscellaneous constitutional and common law torts, as well as a claim under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*

In the present suit, Olivares seeks review of his four unsuccessful employment discrimination complaints and adds a cluster of constitutional, statutory, and common law claims. Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.[1]

---

1. The caption of the Complaint identifies 3 defendants—NASA; Daniel Golden, NASA's Administrator; and John M. Klinberg, Director of GSFC.

Olivares has requested leave to file an Amended Complaint in which he proposes to add several other individual Defendants. The newly pro-

The Court has determined to grant Defendants' Motion for Summary Judgment in all respects. Additionally, while Defendants have only moved to dismiss the EEO claims, the fact that both Defendants and Olivares have relied on extensive material outside the pleadings permits the Court to treat the motion as one for summary judgment. Fed. R.Civ.P. 12(b)(6); *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir.1985); *Chaparro–Febus v. International Longshoremen Ass'n, Local 1575,* 983 F.2d 325, 332 (1st Cir.1992); *Goyette v. DCA Advertising Inc.,* 830 F.Supp. 737, 741 (S.D.N.Y.1993). Summary judgment, therefore, will also be granted in favor of Defendants as to all of Olivares' EEO claims.

## II.

Summary judgment is appropriate if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When a moving party supports his or her motion with affidavits and other appropriate materials, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the ... response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A mere scintilla of evidence supporting the case is insufficient. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

posed individual Defendants include a Director of Engineering; GSFC's Labor Relations Officer; a co-worker who made a security complaint against Olivares; a co-worker who "conspired" to take away Olivares' telephone; the Chief of the Electrical Engineering Division; five employees in the agency's Discrimination Complaints Division; the Head of Security; certain "John/Jane Doe" co-workers who purportedly collaborated with the aforementioned individuals; the Project Managers of the TDRS Project; a member of the Goddard Standing Awards Committee; and Olivares' first-line supervisor.

## III.

At the heart of Olivares' discontent in his belief that he has been discriminated against because of his race (Hispanic) and national origin (Mexican–American). He contends that he has been passed over for promotion for some 20 positions at GSFC and subjected to an endless string of indignities. As recited in the present suit, among other things, he has been the target of "a war of attrition," an "unfair and improper reprimand," "false and fictitious ... documents and statements," "multiple fraudulent, baseless complaints," "personal surveillance," "clandestine investigations," and "perjurious smear-affidavits."

In his first three EEO claims, Olivares described other alleged race/national origin-based or retaliatory insults, including: that he "was given inadequate work space;" he "was denied reassignment;" he was "not permitted to remain" in a certain office; "his performance plan was delayed;" he "was required to provide ... weekly status reports;" his supervisor "relied primarily on written communications transmitted by fax;" his supervisor "would not meet with him" about certain issues; he was "not nominated for an award;" he was "subjected to an institutionalized blacklist;" he "did not receive proper performance plans or appraisals"; and he "was not permitted to retain his security clearance."

In his prior lawsuit, Olivares claimed a series of comparable wrongs. *See* 882 F.Supp. 1545 *passim.*

NASA and the various individual Defendants deny Olivares' claims wholesale. They reject the notion that any sort of employment

Although a plaintiff ordinarily has the right to amend his complaint once "as a matter of course," Fed.R.Civ.P. 15(a), it is questionable whether that right applies to amendments adding new parties. *See Moore v. Indiana,* 999 F.2d 1125, 1128 (7th Cir.1993). However, inasmuch as the newly proposed Defendants are already cited in the text of the original Complaint, the Court will GRANT Plaintiff's Motion. As explained in the text, the Amended Complaint still cannot withstand summary judgment.

discrimination has ever been practiced against him or that any action undertaken with regard to him has ever been undertaken without total justification. They deny, moreover, that certain things Olivares alleges even occurred or that Olivares comes close to stating cognizable causes of action against them. Presumably they also seek to have done with the continuous accusations they believe Olivares has unfairly made against them.

## IV.

The Court has reviewed the record of these proceedings and takes judicial notice of the earlier litigation brought by Olivares against NASA.[2] On the basis of that review, the Court concludes that no rational trier of fact could conclude other than that all of Olivares' claims are totally devoid of merit. Whatever employment slights Olivares may perceive himself to have suffered, he has made out no case for discrimination based on his race or national origin, which is to say Title VII claims. In addition, none of his other purported causes of action have substance. Indeed, the indiscriminate manner in which he has sued or attempted to sue his employer, innumerable supervisors, and co-workers—without exception for frivolous reasons—in itself constitutes a legitimate non-discriminatory basis for his nonpromotion. It no doubt also goes a long way toward explaining the snail's pace of these proceedings, since few individuals, one must assume, care to confront Olivares, given the prospect that he will in all probability respond by suing them. The time has come to cut through the brambles.

Though the Amended Complaint is somewhat disjointed and not set out in discrete counts, it is nonetheless possible to discern from the various allegations the causes of action Olivares is attempting to state. The Court considers each of these.

## V.

### EEO Complaints

#### A) First Three EEO Complaints.

Olivares does not specify in his Amended Complaint what positions he applied for and did not get because of illegal discrimination. However, the Consolidated Decision of the Administrative Law Judge (ALJ) who heard Olivares' first three EEO claims, an exhibit in the prior litigation between Olivares and NASA, does set forth the positions.[3] The ALJ decided that Olivares had not shown—directly, circumstantially, or by the *McDonnell Douglas* calculus [4]—that illegal discrimination played any part in his nonselection for any of these positions. Wholly independently of the ALJ's decision,[5] nothing in the

**2.** *See United States Fidelity & Guar. Co. v. Lawrenson*, 334 F.2d 464, 467 (4th Cir.), *cert. denied*, 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964) (Court may take judicial notice of cases between same parties where the two cases represent related litigation).

**3.** The positions include:

1) Supervisory Computer Engineer
2) Head, Digital Systems Section
3) EAP Data Systems Manager
4) AST, Mission Support Requirements & Developments
5) Earth Observing Systems (EOS) Instrument Manager
6) Head, Optical Communications and Data Systems
7) Trainee, Project Management
8) Manager, Space Network Systems for ATDRS
9) Manager, Mission Operations for TDRS
10) Manager, Flight Telerobotic Service
11) Manager, Explorers and Attached Payloads Project Advanced Missions
12) Deputy Manager, Space Station Freedom Project
13) Deputy Manager, Total Ozone Mapping Spectrometer (TOMS) Project
14) Manager, TOMS Project
15) Manager, Tropical Rainfall Measuring Mission
16) Manager, EOS Missions Systems
17) AST, Aerospace Flight Systems Engineer
18) EOS Systems
19) METSAT Supervisory AST
20) Supervisory Aerospace Engineer

**4.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**5.** While the Court need not rely on the adverse decision of the ALJ, it bears noting that EEO determinations have been deemed admissible evidence in employment discrimination actions. *See Barfield v. Orange County*, 911 F.2d 644, 649–50 (11th Cir.1990), *cert. denied*, 500 U.S. 954, 111 S.Ct. 2263, 114 L.Ed.2d 715 (1991); *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir.1985).

voluminous documents of the past or present case, whether attachments to Olivares' complaints or exhibits to Defendants' motions, suggests otherwise. Quite simply, Olivares has failed to adduce the least amount of direct or circumstantial evidence that he was discriminated against on the basis of race or national origin and the *McDonnell Douglas* approach yields him a no more favorable result.

■ Under *McDonnell Douglas*, in order to establish a *prima facie* case of disparate treatment, a plaintiff must show by a preponderance of the evidence that (1) he is a member of a protected class; (2) his employer had an open position for which he applied or sought to apply; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir.1994); *McNairn v. Sullivan*, 929 F.2d 974, 977 (4th Cir.1991).

■ Assuming Olivares could make out a prima facie case of disparate treatment as to all 20 positions, a difficult proposition,[6] the sole effect would be to shift the burden of production to Defendants to articulate a legitimate, non-discriminatory reason for Olivares' nonselection. *McDonnell Douglas; Ennis v. National Ass'n of Business &*

*Educ. Radio, Inc.*, 53 F.3d 55 (4th Cir.1995). To the extent that Defendants could make such a showing, any presumption of discrimination would drop out of the case and it would remain for Olivares to show that the reason was pretextual, that illegal discrimination was in fact the motivating factor for his nonselection. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Ennis*, 53 F.3d at 57–58. In other words, he would bear the ultimate burden of proving that NASA intentionally discriminated against him. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Hughes v. Bedsole*, 48 F.3d 1376, 1384 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995).

■ Defendants' legitimate non-discriminatory reasons for not selecting Olivares fairly shout from the record of these proceedings. Olivares is an employee who challenges his employer, supervisors and co-workers alike over every aspect of his employment—the location of his office, his telephone, his mail, his obligation to file reports, any and all criticism of his work product, his security clearance—the list is literally as long as the work day. His disagreements, moreover, have been anything but cordial. Consistently they have been both intemperate and vituperative.[7] They have become the basis of lawsuits which, as the prior and present litigation show, are invariably without foundation in law or fact.[8] Such con-

---

**6.** Curiously, the ALJ found that Olivares had made out a *prima facie* case of race and national origin discrimination in regard to his nonselection for the various positions as well as with regard to reprisal, but she went on to credit as legitimate, nondiscriminatory reasons for Olivares' nonselection certain facts bearing on Olivares' *lack of qualification* for the positions, *e.g.* she found that Olivares "either lacked the specific expertise with flight hardware which was being sought or had not demonstrated it as well as the candidate selected." *See also* n. 8, *infra.* But qualification for a position is an element in the establishment of a *prima facie* case under *McDonnell Douglas*, so that in effect the ALJ should have concluded—at least as to several positions—that Olivares had not made a *prima facie* showing of discrimination.

**7.** Given the previously recited catalogue of indignities Olivares says he suffered, he has effectively characterized Defendants as, among other

things, falsifiers, liars, perjurers, spies, and conspirators.

**8.** In his prior suit, for example, Olivares attempted to fashion claims based on what he suggested were unfair or untrue allegations against him, *i.e.* that he had misrepresented his academic degrees and that on one occasion he was believed to have a knife at work, on another a gun. 882 F.Supp. at 1545. But that case demonstrates that Olivares himself never undertook to clarify his actual academic credits when questioned, nor did he follow formal agency procedures for rectifying the record of his alleged involvement with weapons. Indeed, Olivares' refusal to produce his college transcripts and other documents to the ALJ in the EEO proceedings led her to conclude that he lacked a Bachelor of Science degree in Physics, a required qualification for many of positions Olivares complains he was not selected for.

Additionally the Court notes that, in connection with Olivares' first three EEO complaints, the

trariness, such inability to get along with employers, supervisors and co-workers, fully qualify as legitimate non-discriminatory reasons to decline to promote an employee.[9] *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954 (4th Cir.1996). Moreover, there is no conceivable basis for Olivares to argue that these reasons are in any way pretextual to some ulterior plan to disserve him because he may be a Mexican–American. Olivares' race and national origin have absolutely nothing to do with his employment situation. His own opinions and conclusory allegations lack "probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988).

The Court will GRANT Defendants' Motion for Summary Judgment with regard to Olivares' first three EEO complaints.

**B) *Fourth EEO Complaint.***

Olivares' fourth EEO complaint results in summary judgment in favor of Defendants for different reasons.

■ As to that complaint, Olivares suggests that NASA deliberately delayed processing his earlier complaints and committed certain other violations.[10] To begin, howev-

er, there is no separately recognized cause of action for failure to timely process an EEO complaint. *See Young v. Sullivan*, 733 F.Supp. 131 (D.D.C.1990), *aff'd*, 946 F.2d 1568 (D.C.Cir.1991), *cert. denied* 503 U.S. 918, 112 S.Ct. 1291, 117 L.Ed.2d 515 (1992). Olivares, in any event, did not file a formal complaint with the agency's EEO officer within 15 days after his final interview with the EEO counselor as required by 29 C.F.R. § 1614.106(b). Although he received his final notice on June 14, 1994, and thus had until June 29 to file, he did not file his complaint until on or about August 2, 1994.[11]

Moreover, Olivares failed to file his complaint in this Court in timely fashion. Instead of filing within 90 days of October 21, 1993, the date he received the notice of the denial of his claim, *i.e.* by January 19, 1994, Olivares did not file until January 24, 1994. His suggestion that inclement weather entitled him to additional days to file is without precedent and the Court declines to recognize it.

**C) *Retaliation.***

■ The claim that Defendants have retaliated against Olivares because he filed EEO claims is equally groundless. To state

---

ALJ found other legitimate, nondiscriminatory reasons for Olivares' nonselection for several positions, including his lack of qualification for some of the positions and the superior qualifications of other candidates for others. The ALJ also found that faulty work by Olivares, among other reasons, justified his non-receipt of a performance award.

9. The ALJ cited the observations of a number of GFSC officials that Olivares could not work well in a team situation, at times causing disruptions, mumbling uncomplimentary remarks under his breath about co-workers, drawing caricatures of co-workers, and calling some by unpleasant nicknames.

A later incident, not part of Olivares' first three EEO claims, but part of his fourth claim, offers a good perspective on what this case is really about. In March, 1993, using the GSFC internal mail service, Olivares sent a legal notice to Calvin Curlen, a GFSC employee Olivares was suing in the latter's capacity as a union official, someone with whom Olivares had an antagonistic relationship. The notice was accompanied by a cartoon of a shrouded skeleton with an axe (the Grim Reaper), with the words "FINAL NOTICE" in large, block letters above the cartoon. Olivares had added the following message:

"Believe me ... YOU *ARE* DULY SERVED! You couldn't be *better* served ... short of an APPLE in your mouth and a side-order of fries!!"

When Curlen reported this communication to Olivares' supervisor, Dennis J. Andrucyk, Andrucyk sent a memo to Olivares instructing him not to threaten GSFC employees and not to use government mail for personal business. Olivares not only defended his missive to Curlen as humorous and harmless, but now claims that Andrucyk's response was an unfair reprisal motivated by an illicit intent to discriminate against Olivares because of his Mexican–American heritage. Olivares is patently wrong on both counts.

10. These included "new matters of NASA reprisal," *e.g.* an alleged improper remand, the pulling of Olivares' telephone, tampering with his mail, keeping him under surveillance, and allegedly searching his office and person.

11. Well after the initial 15-day period expired, Olivares apparently requested the EEO officer to issue him another final notice. The second notice, however, was ineffective to extend the original deadline.

a claim for retaliation, a plaintiff must establish 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989).

Beyond his own say-so, Olivares has in no way demonstrated a causal connection between protected activity and any adverse action taken against him. Simply because certain events occurred after he initiated his complaints, he asserts their causal connection, the classic *post hoc ergo propter hoc* fallacy. But employees who file EEO complaints are not immune from decisions affecting their working conditions, including for example, as the present case illustrates, reprimands for making threats to co-workers and being subject to procedures for monitoring mail at high level security installations such as GSFC. More than that, the fact that an employee may have filed an EEO claim gives him no license to vilify supervisors or co-workers or indeed to make every response of theirs to such vilification the basis of a claim for retaliation. Unquestionably that is what has occurred here. Olivares has shown no causal connection between personnel actions taken against him and the fact that he may have filed earlier EEO complaints. His claim of retaliation is without foundation.

## VI.

### *Other Claims*

Olivares attempts to state other causes of action arising out of his personnel situation, including claims of conspiracy, constitutional and common law claims of defamation, *Bivens*-type claims for First, Fifth, and Fourth Amendment violations,[12] and claims for viola-

12. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

13. Olivares also refers to the Ninth Amendment, which deals with the people's retention of unenumerated rights. This reference is totally meaningless in the present suit and the Court will

tions of the Prohibited Personnel Practices Act, 5 U.S.C. § 1101 *et seq.*[13]

Some of these claims may be dispatched summarily. There is no constitutional claim for defamation. *Paul v. Davis*, 424 U.S. 693, 701–02, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976). Additionally, any complaint based on prohibited personnel practices under 5 U.S.C. § 2302, *e.g.* whistleblowing, must be pursued through the Office of Special Counsel. Congress intended to create no private statutory right of action in federal courts to enforce that section. *Ryon v. O'Neill*, 894 F.2d 199, 201 (6th Cir.1990); *Carducci v. Regan*, 714 F.2d 171, 175 (D.C.Cir.1983).

What remain are supposed actions for conspiracy, common law defamation, and, depending on the facts, for violations of constitutional rights involving the First Amendment (free speech), the Fourth Amendment (freedom from unreasonable searches), and the Fifth Amendment (due process of law). Olivares, however, comes nowhere close to stating such causes of action.

The Court considers these would-be claims.

### A) *Conspiracy.*

Under the law of Maryland, a conspiracy is defined as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal." *Green v. Washington Suburban Sanitary Comm'n*, 259 Md. 206, 221, 269 A.2d 815 (1970). Conspiracy does not give a right of action unless it leads to wrongful acts or omissions. *Ragan v. Susquehanna Power Co.*, 157 Md. 521, 146 A. 758 (1929). If an act is lawful, a combination or conspiracy to perform it does not make the act unlawful. *Green*, 259 Md. at 221, 269 A.2d 815.

regard it no further. The same is true with regard to Olivares' reference to Exec. Order No. 11,478, 34 Fed.Reg. 12,985 (1969), which deals with the policy of "Equal Employment Opportunity in the Federal Government." The order creates no individual rights vindicable in this Court and will be discussed no further.

Olivares cannot proceed on a conspiracy claim unless and until he can show that the underlying acts or means are unlawful. As previously shown and as will be further shown hereafter, he is unable to do that. Olivares has no cause of action for conspiracy.

B) *Defamation.*

In his prior suit, Olivares alleged that numerous individuals at GSFC circulated false information about him in an elaborate conspiracy to defame him and destroy his career. The Court's predecessor in those proceedings (Nickerson, J.), by order dated June 17, 1993, dismissed all those claims with prejudice. Olivares returns to Court naming again several of the same individuals dismissed in the previous suit and naming still others as additional co-conspirators bent on his destruction.[14] But, as to all defamation claims preceding the June 17, 1993, Order, the claims are precluded. Res judicata not only bars litigation of a claim previously decided on the merits; it bars litigation of all claims available to the parties in the earlier litigation whether or not asserted or determined in the prior proceeding. *Meekins v. United Transp. Union,* 946 F.2d 1054, 1057 (4th Cir.1991); *Peugeot Motors of Am., Inc. v. Eastern Auto Distribs., Inc.,* 892 F.2d 355, 359 (4th Cir.1989), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990).

To the extent Olivares is attempting to assert a claim for acts after June 17, 1993, he still fails. Under Maryland law, defamation is the negligent publication of a false and defamatory statement about another. *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976). Although the alleged defamatory statements in this case are not entirely clear, the facts underlying some statements Olivares appears to complain of are in fact true, *e.g.* he has sent·threatening correspondence to a co-worker and many of his actions have a distinctly antisocial quality. At a minimum, it is impossible to conclude that certain other statements Olivares says were made by his supervisors and co-workers were made negligently. Negligence signifies unreasonable failure to ascertain that a statement is false. *Jacron Sales v. Sindorf, supra.* With regard to Olivares' academic credentials, for example, to this day no one has been able to verify the true state of affairs despite obvious inconsistencies in the record which Olivares himself appears unwilling to clarify. Comments questioning Olivares' academic degrees, therefore, can hardly be deemed negligent. Similarly, to the extent that the Grim Reaper cartoon Olivares sent to Defendant Curlen constituted a threat—and by any reasonable construction it did—an individual's opinion about the act and about the sort of individual who might commit it would support no action for defamation. *See Hughley v. McDermott,* 72 Md. App. 391, 530 A.2d 13 (1987), *aff'd,* 317 Md. 12, 561 A.2d 1038 (1989).

Olivares can build no claim upon supervisory comments relating to the quality of his work. An employer's good faith statements made within the context of the employer-employee relationship are conditionally privileged. *Gay v. William Hill Manor, Inc.,* 74 Md.App. 51, 536 A.2d 690, *cert. denied,* 312 Md. 601, 541 A.2d 964 (1988). Olivares' supervisors had a continuing right to criticize his performance whether or not he agreed with the criticism. So long as they were not practicing illicit discrimination—and clearly they were not—they had a right to relocate his office, to assign or not assign him to various work projects, and to reprimand him when, as here, he sent a threatening message to a coworker. They were fully within their rights when they investigated reports that Olivares might have a gun or knife at work.. *See* 882 F.Supp. 1545. However much such acts might have held one up to scorn or ridicule, they were permissible because they were either not false or were privileged acts reasonably taken in the course of the employment relationship.

Olivares states no claim for common law defamation.

C) *Bivens-type Claims.*

Olivares also claims that a number of his constitutional rights have been violated, including his right to free speech, to be

---

**14.** Named in both suits were Defendants Goldin, Ferguson, Krueger, Schwartz, and Curlen.

free from unreasonable searches and to due process of law. None of these claims can stand. In the first place, *Bivens*-type actions are not recognized against a federal agency, only against federal officers sued in individual capacities. *See Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, ——, 114 S.Ct. 996, 1006, 127 L.Ed.2d 308 (1994). But any claim against the individual Defendants is equally unavailing.

### 1) *First Amendment Claim.*

 From what can be gleaned from the Amended Complaint, Olivares suggests that his First Amendment free speech right has been violated because he was retaliated against for whistleblowing activities regarding NASA contracts and other public spending issues. It is true that federal courts are authorized to award damages where federal officials infringe constitutionally protected interests, *Bivens, supra,* which includes infringements of First Amendment rights. *See Dellums v. Powell,* 566 F.2d 167 (D.C.Cir. 1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). But, generally speaking, where Congress has acted in an area and a remedy exists which is alternative to a *Bivens*-type suit, no *Bivens*-type suit will lie. If Olivares has a whistleblowing complaint, his remedy—as already pointed out—lies elsewhere than by direct action in federal court. *See Hallock v. Moses,* 731 F.2d 754 (11th Cir.1984). In any case, federal civil servants are limited to civil service remedies created by Congress and agencies. No *Bivens*-type actions based on employment-related actions are available to them. *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). These considerations preclude any relief based on the First Amendment in the present case.

### 2) *Fourth Amendment Claim.*

 Olivares next suggests a series of violations of his Fourth Amendment rights including unauthorized searches of his office and person, the opening of his mail, and the monitoring of his phone calls. Again, while *Bivens* recognizes the possibility of claims against federal officials for abridgement of Fourth Amendment rights, *Lucas* suggests that claims pertaining to working conditions of the federal employee are more properly remedied under civil service regulations rather than through federal constitutional tort actions. This is particularly true in light of the fact that Olivares' claims of Fourth Amendment violations are interwoven with claims involving the propriety of relocation of his office, the alleged withholding of his telephone number, unwarranted reprimands, his failure to receive "meaningful work," and a general suggestion of conspiracy against him by a host of supervisors and coworkers—all quintessentially employment-related complaints.

 Quite apart from this, Defendants' unrebutted response on the merits to a number of Olivares' would-be Fourth Amendment claims show just how frivolous those claims are. The record indisputably shows, for instance, that, with regard to the allegedly unjustified investigation of a report that Olivares had a gun at work, Olivares consented to a search of his office by the GSFC security guard. Furthermore, Olivares cannot rebut the fact that NASA opened a registered letter of his pursuant to an agency-wide policy of examining registered mail for classified material. The letter in question, in which the Office of Equal Opportunity Programs dismissed Olivares' fourth EEO complaint as untimely, was sent to Olivares at his NASA office at his request. Having been sent registered mail, it was opened pursuant to NASA's standard security policy. Despite this and the fact that Olivares waived any responsibility for breach of confidentiality when he asked for EEO correspondence to be sent to him at work, he has nonetheless persisted in this claim.

 Olivares' vague claims that at some point his phone calls were monitored are similarly spun of gossamer. NASA has presented affidavits that it never recorded any messages from Olivares' extension and at most for a limited period kept records of telephone numbers dialed from all center telephone extensions when the number "9" was dialed as an outside access number in order to identify unused extensions for possible reassignment. Recording telephone numbers dialed from a particular telephone

is not a search within the meaning of the Fourth Amendment and no warrant is required to carry it out. *Smith v. Maryland,* 442 U.S. 735, 745–46, 99 S.Ct. 2577, 2582–83, 61 L.Ed.2d 220 (1979). In this, as in his other sallies, Olivares has no basis in fact.

### 3) *Fifth Amendment Claims.*

Finally, Olivares brings in the Fifth Amendment, presumably on the theory that all of the actions taken with regard to him have denied him due process of law. But the Court has no obligation to be more specific than Olivares himself has been with regard to the manner in which his Fifth Amendment rights may or may not have been violated. Suffice it to say that such procedural rights to due process as Olivares may have, have been fully satisfied. His substantive rights have in no way been violated. In the end, no triable issue of fact remains. All actions taken with regard to Olivares by all Defendants at all times have been fully consistent with the law.