**Joseph E. DAVIS, Plaintiff,**

v.

**Tommy G. THOMPSON, Secretary, Department of Health and Human Services,[1] Defendant.**

**No. CIV. PJM 04–445.**

United States District Court, D. Maryland.

March 24, 2005.

---

1. Tommy G. Thompson is no longer Secretary of HHS. The incumbent is Michael Leavitt.

Charles R. Work, Francine Allyn Hochberg, Mark Hunter Churchill, Washington, DC, for Plaintiffs.

Allen F. Loucks, Kristine L Sendek Smith, Baltimore, MD, for Defendants.

## *OPINION*

MESSITTE, District Judge.

Joseph E. Davis has sued the Secretary of the U.S. Department of Health and Human Services (HHS) for violation of the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 691 *et seq.* (Count 1) and violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* (Count 2).[2] Defendant has filed a Motion to Dismiss, or in the Alternative, *for* Summary Judgment. Having considered the briefs and oral arguments of counsel, the Court will GRANT the Motion to Dismiss as to the FMLA claim and the Motion for Summary Judg-

ment as to the disability discrimination claim.

### I.

Davis was hired as an animal caretaker in the Center for Biologics Evaluation and Research (CBER) of the Food and Drug Administration (FDA), an agency within HHS. As of Fall 2000 he had worked in that capacity for 24 years and was approximately 52 years of age.

In October 2000 Davis was diagnosed with throat cancer and sought leave from work. On the basis of accumulated sick leave as well as donated leave from fellow employees, leave was granted.

On or about December 4, 2000, Dr. Sheela Puttaswamaiah, Davis's radiation oncologist, wrote a letter to Dr. Philip Snoy, Davis's supervisor, advising him: that Davis's radiation treatment had commenced on October 25, 2000 and was expected to last 7½ to 8 weeks; that Davis would suffer various side effects, including fatigue; that, while all his symptoms would improve within the first 2–3 weeks after completion of the radiation treatment, the fatigue might last as long as 2–3 months; and that Davis appeared to be "significantly affected by the fatigue to the point that he feels he is unable to perform his daily activities, including his job." Although Puttaswamaiah noted that Davis's "overall prognosis after receiving radiation treatment should be very good to excellent," she requested that "he be allowed some time off work to allow him to cope and recover from his symptoms."

Based on this letter, Snoy granted Davis sick leave through December 15, 2000, and later added two weeks of sick leave until January 2, 2001. Snoy's understanding of Puttaswamaiah's letter was that there was

---

**2.** Davis also sued Dr. Philip Snoy individually for intentional infliction of emotional distress (Count III) and negligent infliction of emo-

tional distress (Count IV). The Court previously granted Snoy's Motion to Substitute [the Government as] Defendant.

no impediment to Davis returning to work in January, albeit there would be obvious limitations in view of his medical condition.

Snoy has stated in an affidavit that, on December 27, 2000, he advised Davis by phone that he was obliged to file a further request for leave and that he had to provide more extensive medical documentation indicating why he was unable to return to work. Failing that, Snoy told him, Davis was expected to return to work on January 2, 2001. Snoy did not mention leave potentially available under the Family Medical Leave Act. Davis has alleged in this suit—although he never did so while his claim was being considered by either HHS or the Merit Systems Protection Board—that Snoy told him in that conversation that it would be futile for him to ask for leave and that is why he never asked for it. Davis says Snoy expressed his belief that Davis was lying about his condition and demanded that he return to work immediately.

Davis did not return to work on January 2, 2001 and never returned to work thereafter.

On February 16, Snoy sent him a letter reiterating that he had run out of medical leave in December and that therefore, since January 2, he was in Absence Without Leave (AWOL) status. Snoy cautioned Davis that if he was "medically unable to report for duty as ordered and to perform the duties of [his] position of Biological Science Laboratory Technician," he "must provide acceptable medical documentation ... must be responsive to the

Documentation of a Medical Condition" form Snoy enclosed with the letter. Snoy also instructed Davis to complete one of three enclosed forms depending on whether he wished to request leave, disability retirement, or simply retirement.

Snoy closed his letter warning Davis that if he failed to follow Snoy's order to report for duty by no later than March 9, or if he failed to provide acceptable medical documentation on the basis of which Snoy could approve or disapprove of his absence, Snoy would initiate administrative action proposing Davis's removal from his position. Snoy directed Davis to call him if he had any questions or concerns about Snoy's orders, and provided Davis with the name and contact information of an employee in the Division of Employee and Labor Management Relations who could answer any questions concerning the policies and procedures at issue. On February 22, Davis called Snoy, acknowledging his receipt of this letter.

On March 13, Snoy and Davis spoke again by phone. Davis inquired whether Snoy had received his medical documentation and Snoy said he had not. Snoy again advised Davis that he needed to submit the required leave forms included in the letter of February 16, and that Davis remained on AWOL status.

Shortly thereafter Snoy received a copy of a letter from Davis's treating physician, Dr. Joel Schulman, that bore the date March 7. In the letter, Schulman noted that, while Davis was suffering from diverticulosis/diverticulitis[3] and unexplained

---

**3.** Diverticulosis occurs when small pouches bulge outward through weak spots in the colon and is believed to be caused by the strains associated with the constipation that attends a low-fiber diet. If the pouches become infected or inflamed, the condition is called diverticulitis, which can be identified by tenderness around the left side of the lower abdomen. *National Digestive Diseases Information Clearinghouse*, National Institutes of Health, http://digestive. niddk.nih.gov/ ddiseases/pubs/ diverticulosis/. About "one-half of all Americans between the ages of 60 and 80, and almost everyone over age 80, have diverticulosis." If diverticulosis develops into diverticulitis, it is usually treated with antibiotics. *Does Diverticulosis Demand Dietary Changes?*, ENVIRONMENTAL NUTRITION, Jan. 1, 2000 at 7. Schulman also noted that Davis had a pedunculated polyp in the sigmoid colon, meaning

weight loss, he presented as a "relatively well developed, well nourished, anxious male" whose "prognosis at this time is hopefully good." Schulman said nothing about Davis's inability to perform the essential duties of his job.

Snoy forwarded Schulman's letter to the FDA's consulting physician, Dr. Bruce Butler, for an opinion as to whether the conditions noted by Schulman prevented Davis from returning to work. Butler's eventual report was that "the letter does not indicate any current impairment that would prevent useful and efficient service," and that Davis's diagnosis did not indicate any condition that would "interfere with [his] ability to perform the essential functions of his job."

Snoy sent Davis another letter on March 22, 2001, advising him of Butler's conclusions. The gist of the letter was that since Schulman, "did not state that [Davis] was incapacitated for duty," Snoy expected Davis to "report to duty within 5 days of receipt of [the] letter" or he would "begin proceedings to remove [Davis] from [his] position and employment with the Food and Drug Administration."

On March 28, Davis responded to the letter by calling Snoy and informing him that he still did not "feel right." Snoy again told Davis that he had not received any of the required leave forms or appropriate medical documentation. Snoy indicated to Davis that he would work with him on his feelings of fatigue, but that Davis needed to return to work. In the meantime Davis was told he remained on AWOL status. That same day Davis sent Snoy a handwritten note from Schulman, indicating that Davis was being referred to a neurologist after he reported feeling "pins and needles" throughout his spine.

Snoy forwarded Schulman's note to Butler for a further opinion.

On April 4, Butler called Schulman to inquire about Davis's ability to return to work. Butler asked Schulman if he was aware of any medical reasons that would prevent Davis from returning to full unrestricted duty. Schulman said he was not aware of any such reasons, stating that, while Davis had returned to his office several times with new complaints, in each instance Schulman's tests and referrals showed no objective support for his symptoms. Schulman concluded by hypothesizing that "there could be a psychiatric condition causing the prolonged work absence." In light of this conversation, Butler advised Snoy that "[t]o date, there is no biologic or psychological justification for the continued absence from work" and that Schulman was "unaware of any impairment that would significantly interfere with Mr. Davis's ability to provide useful and efficient services in his job position."

On April 10, Davis faxed Snoy a copy of a letter from Davis's neurologist, Dr. Norman Luban, to Schulman. In the letter Luban informed Schulman that he had examined Davis and had received an MRI report that mentioned that Davis had discogenic disease with posterior disc bulges at two levels. Luban continued: "[a]part from that he is healthy," the "neurological examination is normal," and "[m]ental status is normal with good comprehension and fluent speech." Luban concluded by stating his concern that Davis might be at risk for a more serious injury if he were involved in a slip-and-fall situation or a rear-end collision, but made no observations about Davis's inability to return to work.

that there was a small vascular growth attached by a stem to the portion of his large intestine leading to his rectum (as opposed to being attached by a broad base, which is a

sessile polyp). Jay R. Varma and Luther R. Mills, *Colon Polyps*, JOURNAL OF FAMILY PRACTICE, Aug. 1992 at 194.

On April 11, Davis called Snoy to see if he had received the copy of the letter from Luban to Schulman. Snoy confirmed his receipt of the letter and informed Davis that he had forwarded it to Butler for his review. Snoy again urged Davis to submit the required leave forms, as he was still on AWOL status.

On review of the correspondence between Luban and Schulman, Butler once again concluded that there "is no medical evidence that clearly inhibits or would substantially interfere with the ability to perform the essential functions of the job."

On April 23, Davis faxed to Snoy a one-page handwritten note from Dr. John Barrett in which Barrett indicated that Davis was disabled from work from April 23 until May 15, 2001 due to "cervical disc and cervical strain." Since this notation was unaccompanied by any explanation, the FDA's reviewing physician was unable to conclude that the note justified Davis's continuing absence from work.

Davis called Snoy on the same day he faxed Bennett's note to Snoy to confirm Snoy's receipt of the note. Snoy confirmed his receipt of the note, but once again reminded Davis that he still had not submitted the proper leave request forms.

Sometime in late May or early June, Davis submitted a letter from Dr. Anjum Kahn to Schulman dated May 16, 2001, in which Kahn concluded that Davis's "examination continues to remain normal." Kahn noted that "[a]lthough [Davis] appears to have no evidence of disease, he has not been successfully able to return to his work." Reviewing these final submissions, Butler concluded that Kahn did not feel that the degree of severity of the bulging disks was enough to cause concern or he would not have found that Davis "appears to have no evidence of disease." Accordingly, Butler once again advised the FDA that he did "not see a barrier to Mr. Joseph Davis' return to the work place and

his ability to provide useful and efficient service."

On April 25, Davis again called Snoy, this time indicating that he planned to return to work on Monday, April 30. Snoy told Davis that the agency would accommodate Davis's fatigue so that Davis could make it through the working day. On April 26, Davis had a similar conversation with his team leader, Ray Olsen. On Friday, April 27, however, Davis called Snoy to say that he "just could not" return to work. Davis indicated to Snoy that he would be willing to take a lump sum payment from his retirement account if necessary, but that he did not plan to return to work.

On May 3, when Davis called Snoy again, Snoy recommended that Davis contact David Leffler, a Supervisory Employee Relations Specialist at FDA, to obtain information regarding possible disability retirement. Snoy also informed Davis that he was proposing his removal from the federal service.

On June 13, Snoy sent Davis a formal notice that he was proposing termination of his employment based on three charges. "Charge 1" involved Davis's "failure to follow established leave procedures," including failure to follow the required procedures for having medical leave approved. "Charge 2" was Davis's "failure to follow supervisory instructions," specifically on the dates on which Snoy had directed him to submit the required leave forms and report to work, which Davis had "not complied" with. "Charge 3" was that since "January 2, 2001, [Davis had] been in an Absence Without Leave (AWOL) status due to [his] failure to request leave approval or to report to work," a total of approximately 776 hours of absence without leave.

Snoy explained that, during his long history of service in the FDA, Davis not only

had incurred previous citations for leave violations, but that he clearly knew what he was supposed to do to request leave. Snoy further noted that Davis's lengthy absence had placed a burden on his co-workers, and made it impossible for his supervisors to depend on him to ever return to work.

Snoy's letter gave Davis notice that he had 14 calendar days to respond to Snoy's charges, orally or in writing, to Dr. Neil Goldman, Associate Director of Research of CBER. Over the next two weeks, approximately 20 times either Snoy or another employee from the FDA acting for Snoy attempted to telephone Davis about communicating with Goldman. Davis never replied either to the notice of his proposed removal or to any of the multiple phone calls.

On July 24, 2001, Goldman issued a "Decision to Remove" Davis, upholding the charges in Snoy's proposal of removal. Accordingly, Davis was advised that effective August 3, 2001, he would be terminated from his employment, which in fact he was.[4]

Davis thereafter filed a timely complaint of disability discrimination.[5]

In his pre-hearing conference with the MSPB administrative law judge (ALJ), Davis raised disability discrimination as an affirmative defense to his removal but made no mention of a possible Family Medical Leave Act (FMLA) leave claim. Since he offered no new evidence, the ALJ relied on the medical documentation Davis had previously submitted to Snoy.

Following a hearing, the ALJ issued her initial decision, finding that Davis had failed to prove his removal was based on disability discrimination. In addition, she *sua sponte* raised the issue of the Family Medical Leave Act.

As to the former, the ALJ observed that, under the Rehabilitation Act, "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities" and which "forecloses generally the type of employment involved in the claim." She continued: Once a claimant establishes that he has a disability within the meaning of the statute, he must show that the challenged action was based on his disability and must then articulate a reasonable accommodation under which he believes he could perform the essential duties of his position or must point to a vacant position to which he could be reassigned. In Davis's case, the ALJ found that "[n]one of the medical evidence that [Davis] provided during the proceedings before the agency or here showed that he has a mental or physical impairment that substantially limits a major life activity."

In addition, the ALJ noted that "an essential element of employment is to be on the job when one is expected to be there," such that AWOL problems would constitute a "valid reason for removal." After taking evidence on the hardship Davis's prolonged absence had caused his work unit, and marking Davis's acquiescence in the chronology of events described by Snoy and others, the ALJ found that his removal "was within the bounds of reasonableness."

As for the FMLA, the ALJ *sua sponte* suggested that, to the extent Davis might be contemplating such a claim, he would not in any event qualify. That would be

---

4. In the Merit Systems Protection Board's Final Decision of October 18, 2002, it was noted that Davis "did not deny or rebut Dr. Snoy's chronology of events."

5. Davis's initial complaint was dismissed by the EEOC because it was a mixed-case complaint appealable to the Merit Systems Protection Board (MSPB). Davis thereafter filed an appeal with the MSPB.

because Davis's maximum entitlement under the Act would be twelve (12) weeks of forty (40) hours per week of leave, *i.e.* 480 hours, whereas the time that Davis was judged AWOL was in excess of 770 hours. The ALJ thus concluded that "this avenue was not open to [Davis] in this appeal, even if he had asserted it and complied with the statutory and regulatory procedures for requesting it." Davis's removal was ultimately sustained on the grounds of misconduct.

Davis's petition for review of the ALJ's decision to the MSPB appended several additional medical documents. The Board, however, issued a Final Decision affirming the ALJ's initial decision, noting in particular that Davis had failed to present new and previously unavailable evidence to warrant a review.

Suit in this Court followed.

## II.

### A.

A motion to dismiss based on lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) raises the question of whether the court has the competence or authority to hear the case. The "plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged" since the "party who sues the United States bears the burden of pointing to an unequivocal waiver of immunity." *Williams v. United States,* 50 F.3d 299, 304 (4th Cir.1995) (internal citations omitted). Motions to dismiss for lack of subject matter jurisdiction are properly granted where a claim fails to allege facts upon which the court may base jurisdiction. *Crosten v. Kamauf,* 932 F.Supp. 676, 679 (D.Md.1996).

Under Federal Rule of Civil Procedure 12(b)(6), a court may not dismiss a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gib-*

*son,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Trulock v. Freeh,* 275 F.3d 391, 405 (4th Cir.2001). While the court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.,* 991 F.2d 94, 97 (4th Cir.1992), the court is not obliged to accept plaintiff's "conclusory allegations regarding the legal effects of the facts alleged." *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995). A complaint that fails to state a legal claim will be dismissed. *District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085–86 (4th Cir.1979).

### B.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56; *see also Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to demonstrate the absence of any material issue of fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party satisfies his initial burden, the non-moving party "may not rest upon his allegations," but must present evidence demonstrating the existence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court is obliged to view the facts and inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III.

Davis claims that his rights were violated under both the FMLA and the Rehabilitation Act. The Government contends that he has no right of action under the FMLA, and denies that he was discriminated against on the basis of a disability.

### A.

■ With regard to the FMLA claim, the law is clear and Davis apparently does not dispute that, as a permanent federal civil service employee covered by Title II of the FMLA, he has no direct right of action to pursue such a claim in federal district court. 5 U.S.C. §§ 6381(1); 5 C.F.R. § 630.1201(b)(i).

Davis attempts to circumvent this prohibition by arguing that he has a claim under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, which he says grants him a right to judicial review of a federal agency action.

That approach, however, was specifically rejected in *Mann v. Haigh*, 120 F.3d 34, 37 (4th Cir.1997). The exclusive remedy for federal employees challenging agency action is the Civil Service Reform Act (CSRA), which obliges federal employees who seek redress for FMLA violations to pursue their claims through grievance procedures or agency management. While the CSRA may not specifically address the FMLA, that does not amount to an implied waiver of sovereign immunity. Thus, while a Title II federal employee may bring a FMLA claim before the MSPB, and thereafter appeal to the U.S. Court of Appeals for the Federal Circuit, once that is done, that is the end of the road. The APA cannot be used to circumvent this limitation. *Mann*, 120 F.3d at 37; *Russell v. United States Dept. of the Army*, 191 F.3d 1016, 1019 (9th Cir.1999) ("the absence of an express waiver of the government's sovereign immunity in Title II of the FMLA bars private suits for violations

of its provisions"); *Keen v. Brown*, 958 F.Supp. 70, 73–74 (D.Conn.1997); *Kallen v. United States Dept. of Defense*, 2004 WL 2137636, at *4, 2004 U.S. Dist. LEXIS 19576, *11–14 (S.D.Ind.2004).

Davis attempts to distinguish his case from *Mann*. The employee in *Mann* was a non-preferred employee excluded from CSRA coverage, who for that reason argued that he was entitled to judicial review under the APA. The *Mann* court rejected this argument on the ground that the employee could not reasonably expect the APA to provide him with a more expansive degree of review than that provided for covered employees. Davis, however, contends that *Mann's* prohibition of APA review is not applicable to his case since he *is* covered by the CSRA, and since the CSRA is silent regarding review of "an illegal denial of employee benefits," he should have recourse to the APA. Davis urges the Court to view the silence of the CSRA as merely an "uninformative consequence of the limited scope of the statute," not a "manifestation of a considered congressional judgment" that his claims should go unheard by this Court. *Dugan v. Ramsay*, 727 F.2d 192, 194–95 (1st Cir. 1984); *Hassenfeld–Rutberg v. United States*, 112 F.Supp.2d 77,79–80 (D.Mass. 1998).

The cases upon which Davis relies to support his argument are inapposite. In *Dugan* the plaintiff was not an employee; he was challenging government regulations that affected his application for employment and accordingly had no agency grievance procedures to resort to. The court rejected the Government's argument that court review of final personnel decisions that do not find their way to the MSPB is Congressionally prohibited. 727 F.2d at 195. Similarly, in *Hassenfeld–Rutberg*, a plaintiff was granted review under the APA because she was suing a federal

agency that had never been her employer for violating its own regulations. But the court expressly acknowledged that *"when CSRA is being applied* to a federal employment dispute, the Merit Systems Protection Board (MSPB) and the Federal Circuit have exclusive jurisdiction." 112 F.Supp.2d at 79 (emphasis in original), *citing United States v. Fausto,* 484 U.S. 439, 455, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988).

Not only did Davis's employment grievance "find its way to the MSPB," but the MSPB specifically considered his potential FMLA claim and rejected it. His only further avenue of redress would have been an appeal to the U.S. Court of Appeals for the Federal Circuit. The APA, however, was not and is not available to end-run Title II's prohibition against a right of action for federal employees in federal district court. Lacking jurisdiction, the Court has no choice but to dismiss the FMLA claim (Count I) for lack of subject matter jurisdiction.

### B.

Davis also alleges he was discriminated against on the basis of a disability.

■ Under the Rehabilitation Act of 1973 section 504, "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability be excluded from the participation in, be denied the benefits of, or be subject to discrimination" by specified employers. To establish a *prima facie* case under the Rehabilitation Act, a plaintiff must demonstrate that he (1) is a "disabled" individual; (2) is "otherwise qualified" for the position; and (3) was removed from his position as a result of his "disability." *Davis v. Univ. of N.C.,* 263 F.3d 95, 99 (4th Cir.2001). Once a *prima facie* case is established, the government may offer legitimate, non-discrim-

inatory reasons for the adverse employment action. *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 278 (4th Cir.2000). To defeat summary judgment, the plaintiff must adduce evidence from which it could be concluded by a preponderance of the evidence that the government's reasons were merely pretextual. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[6]

The Rehabilitation Act defines a "disabled" individual as: (1) any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 29 U.S.C. § 705(20)(B). "Major life activities" have been defined by the Equal Employment Opportunity Commission as "functions such as caring for one self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). An "impairment which limits" one's "major life activities" is one in which an individual is (i) unable to perform a major life activity that the average person in the population can perform; or (ii) which significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which an average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1)(ii). In determining whether a plaintiff meets these criteria, a court considers such factors as (a) the nature and severity of the impairment; (b) its duration or expected duration; and (3) any permanent or long term impact. 29 C.F.R. § 1630.2(j)(2).

---

**6.** The burden shifting scheme of *McDonnell Douglas* applies to claims of disability-based discrimination under the Rehabilitation Act as well as the ADA. *Ennis v. Nat'l Assoc. of Business & Educ. Radio,* 53 F.3d 55, 58 (4th Cir.1995).

Davis contends that his physical and psychiatric impairments substantially limit his major life activity. of working since they significantly restrict the condition, manner, and duration in which he can perform his job, as compared to an average person in the general population. He points out that he suffers fatigue, dizziness, exhaustion and loss of appetite as a result of radiation therapy, has developed back and shoulder problems, and suffers from depression, anxiety and paranoid schizophrenia. These physical and mental impairments, he says, rendered him too weak to attend to work in general, not just at the CBER, since he was barely mobile without assistance and had severe difficulties grooming and dressing himself. He further points out that a psychiatrist concluded in an August 27, 2003 examination, "This man is paralyzed by fears and paranoia. He is unable to work in any capacity." Thus, he concludes, he "is foreclosed from employment in his field, classifying him as 'disabled' under the Rehabilitation Act."

The Government disputes that Davis has produced evidence demonstrating that, prior to his removal, he was significantly restricted in the performance of a major life activity as compared with the average person in the general population prior to his removal. As previously noted, all the medical documentation Davis submitted to Snoy, as reviewed by Dr. Butler, indicated that Davis had a "good to excellent" prognosis, "no evidence of recurrence" of cancer, neurological exams and mental status that were "normal," and "no evidence of disease." Davis's complaints that he had fatigue and some tingling in his lower back, coupled with one physician's speculation that "there could be a psychiatric condition causing prolonged work absence," did not and do not suffice to establish the existence of a medical condition that significantly restricts one or more major life activities, let alone justify 776 unauthorized hours of absence from work.

The Government further submits that even if Davis were able to provide adequate documentation of being "disabled" at this juncture, the relevant question is whether the FDA had reason to know he had a disability during the time period he claims he fell within the protection of the Rehabilitation Act, i.e., at the end of 2000 and the beginning of 2001. *Clouatre v. Runyon,* 82 Fed.Appx. 972, 973 n. 5 (5th Cir.2003), *citing Taylor v. Principal Fin. Group,* 93 F.3d 155, 165 (5th Cir.1996) ("Where the disability, resulting limitations, and necessary reasonable accommodations, are not ... apparent to the employer ... the initial burden rests primarily upon the employee, or his health-care provider, to specifically identify the disability ... and to suggest the reasonable accommodations.").

The Court agrees with the Government that Davis has not satisfied his burden as to the first requirement for establishing a *prima facie* case of disability discrimination. As of the time he was terminated, the evidence simply did not, even arguably, establish that he was limited in the performance of the major life activity of working.

Davis's claim that he was "terminated because of [the Government's] inability to recognize his disability" in fact comports with the Government's contention that it did not regard Davis as disabled. But the crucial point is that the Government's conclusion stemmed from medical documentation Davis himself provided, from which its medical reviewer concluded that Davis was able to return to work even though Davis may have felt he was not. Given the tenor of the medical evidence, as discussed above, the Government could fairly conclude that Davis did not have a qualifying disability and that he was remiss in failing

to heed the repeated orders that he return to work.

The second requirement for a *prima facie* disability discrimination claim under the Rehabilitation Act is that the plaintiff must demonstrate that, despite his disability, he is "otherwise qualified" for the position. The Rehabilitation Act specifically provides that "no otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be ... subject to discrimination." 29 U.S.C. § 794; 29 C.F.R. § 1630.2(m). To satisfy this requirement, a plaintiff must establish that he can perform the "essential functions" of his position; i.e., the fundamental job duties of the employment position. 29 C.F.R. § 1630.2(n). If he can do so, the employer is required to provide reasonable accommodation to the employee unless the employer can show that to do so would impose an "undue hardship" on its operations. 29 U.S.C. § 791. "Reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, [and] acquisition or modification of equipment or devices." 29 C.F.R. § 1613.704.

■ Davis claims he was "otherwise qualified" as a Biological Science Technician, and that the Government failed to reasonably accommodate him by not providing him with a "modified work schedule so that he could recover from the cancer and his attendant mental and physical disabilities." The Government responds, however, that for an employee to be considered "otherwise qualified," the employee must not only have the required skills, but must be "willing and able to demonstrate these skills by coming to work on a regular basis." *Tyndall v. National Education Centers, Inc.*, 31 F.3d 209, 213 (4th Cir.1994). In other words, an "employee who cannot meet the attendance requirements of the job at issue cannot be consid-

ered a 'qualified' individual" under the Rehabilitation Act. *Id.*

The Court agrees with the Government that Davis fails to meet this requirement for a *prima facie* case of disability discrimination as well. His absence from work began in November 2000 and continued through May 3, 2001, at which point he was still telling Snoy he would not return to work. The Government correctly notes that "a person who cannot come to work cannot fulfill any, much less the essential functions of a job." *Farrish v. Carolina Commercial Heat Treating, Inc.*, 225 F.Supp.2d 632, 636 (M.D.N.C.2002). Simply put, there was no job restructuring, part-time or modified work schedule that he could be offered.

But, says Davis, even if a modified work schedule could not have accommodated him, an alternative reasonable accommodation would have been to grant him "adequate medical leave ... during which time he would have recovered from cancer and his attendant mental and physical disabilities." He supports his claim that "reasonable medical leave" is an appropriate accommodation by citing to a case holding that an employee was entitled to leave to participate in an alcohol rehabilitation program. *Rodgers v. Lehman*, 869 F.2d 253, 259 (4th Cir.1989).

The Government suggests that Davis's claim that he needed time to "recover" is difficult to reconcile with his claim that he is so "disabled" that he is "too weak to attend work in general," and is "disqualified from all jobs in the field of animal research ... because of his physical and mental impairments."

But more importantly, says the Government, Davis's proposed remedy does not overcome "the requirement that the employee has, in good faith, engaged in an interactive process to identify, in cooperation with the employer, what would consti-

tute a reasonable accommodation." *May v. Roadway Express,* 221 F.Supp.2d 623, 627–28 (D.Md.2002).

The Court is constrained to agree with the Government. Even if Snoy had indicated to Davis in their December 2000 conversation that applying for additional leave would be futile— an allegation Davis never raised prior to this suit and which Snoy denies— that fact is ultimately irrelevant. The irrefutable evidence is that as of February 16, 2001, Davis had been given multiple opportunities to return to work or at least to submit the required leave forms (which he never did) and appropriate medical documentation (which he did do, but which did not support his claim of inability to return to work). Not only did he decline Snoy's offers to accommodate his fatigue if he returned to work, he failed to engage in any discussion about when he might return to work in any capacity. That Davis might have retained a "subjective belief about the futility of initiating the interactive process will not, by itself relieve him of that obligation." *Id.* at 628.[7]

■ Davis's suggestion that an open-ended period of medical leave would have accommodated his disabilities ultimately asks too much. The Government reasonably contends that if this was the type of accommodation Davis required, in addition to keeping Davis from being considered "otherwise qualified," it would have imposed an "undue hardship" on its operations. During his absence the Government had to hire a full-time animal caretaker to perform his duties, had difficulties planning the work of the office since there was

no way to predict whether or not Davis would eventually report to work, and had to impose additional tasks on Davis's former co-workers. An indefinite indisposition to work does not trigger an obligation on the employer's part to offer a "reasonable accommodation" under the Rehabilitation Act. *Gibson v. Henderson,* 129 F.Supp.2d 890, 898 (M.D.N.C.2001); *Lassiter v. Reno,* 86 F.3d 1151 (4th Cir.1996) ("The Rehabilitation Act does not envision requiring the employer to wait an indefinite period for an accommodation to achieve its intended effect.").

■ Davis's failure to establish that he was suffering from a "disability," his failure to report to work, and his failure to work with the Government in an effort to fashion a reasonable accommodation for his return to work were part and parcel of the Government's legitimate non-discriminatory reasons for terminating him. Specifically:

a) He did not apply for leave as required;

b) He did not follow his supervisor's orders to return to work;

c) He was AWOL for an extended period of time; and

d) In addition, he never attempted to explain to the Associate Director of Research of CBER, Dr. Goldman, what his position was before in fact he was terminated.

Nevertheless, Davis contends that these reasons were pretextual, that he was really terminated because Snoy "disliked" him

---

**7.** This requirement is not obviated by Davis's present claim that he was also suffering from a mental disability. The fact that one of Davis's physician's speculated to Dr. Butler that Davis may have a "psychiatric condition" does not suffice for Davis to meet the requirement that, "[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not ... apparent to the em-

ployer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee, or his healthcare provider, to specifically identify the disability ... and to suggest the reasonable accommodations." *Clouatre v. Runyon,* 82 Fed. Appx. 972, 973 n. 5 (5th Cir.2003), *citing Taylor v. Principal Fin. Group,* 93 F.3d 155, 165 (5th Cir.1996).

and did not want to reasonably accommodate him. This proposition does not merit serious consideration. The incontrovertible evidence is that Snoy requested the required leave forms from Davis on at least four occasions, had all of Davis's medical documentation reviewed by the FDA's physician who rendered independent opinions as to their significance, repeatedly requested that Davis return to work, offered to accommodate any fatigue on Davis's part, and directly or indirectly attempted to contact him approximately 20 times to solicit a response to his proposed removal. It is Davis's burden to demonstrate that the Government's reasons were pretextual. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). His own speculation, however sincerely he may hold to it, is insufficient as a matter of law to withstand summary judgment. *Goldberg v. B. Green and Co., Inc.,* 836 F.2d 845, 848 (4th Cir.1988); *Olivares v. NASA,* 934 F.Supp. 698, 704 (D.Md.1996).

It is unfortunate that Davis acted without the benefit of legal counsel until the present suit was filed. He may indeed, to some unknown extent, have had psychological issues—although there is no indication that the Government was adequately alerted to this or, in any case, that it had any duty to investigate this possibility and be penalized if it did not.

But the Court finds no flexibility in the law which would permit Davis's late-conceived arguments as to lack of counsel and mental distress to excuse his failure to comply with appropriate personnel requirements or to justify his conduct five years ago. Perhaps the better course from the outset would have been for Davis to seek disability retirement, which he had an opportunity to do then and which he apparently would like to do now. Without doing violence to legal principles, however, the Court is unable to afford him the relief he currently seeks.

IV.

For all these reasons, the Government's Motion to Dismiss is GRANTED as to Count I (FMLA claim) and the Motion for Summary Judgment is GRANTED as to Count II (disability discrimination claim).